898 So.2d 790 (2003)
Jeffrey LEE
v.
STATE.
CR-00-0084.
Court of Criminal Appeals of Alabama.
October 26, 2001.
Opinion on Return to Remand June 27, 2003.
Rehearing Denied August 22, 2003.
*807 Angela L. Setzer and Bryan A. Stevenson of Equal Justice Initiative of Alabama, Montgomery, for appellant.
William H. Pryor, Jr., atty. gen., and David R. Clark, asst. atty. gen., for appellee.
BASCHAB, Judge.
The appellant, Jeffrey Lee, was convicted of two counts of capital murder for the killings of Jimmy Ellis and Elaine Thompson. The murders were made capital because the appellant committed them during the course of a robbery or an attempted robbery. See § 13A-5-40(a)(2), Ala.Code 1975. He was also convicted of an additional count of capital murder, pursuant to § 13A-5-40(a)(10), Ala.Code 1975, because he killed Jimmy Ellis and Elaine Thompson by one act or pursuant to one scheme or course of conduct. Finally, he was convicted of attempting to murder Helen King. See §§ 13A-6-2 and 13A-4-2, Ala.Code 1975. After a sentencing hearing, the jury recommended, by a vote of 7 to 5, that the appellant be sentenced to imprisonment for life without *808 the possibility of parole for the capital offenses. The trial court overrode the jury's recommendation and sentenced the appellant to death for the capital offenses. It also sentenced him to serve a term of life in prison on the attempted murder conviction. This appeal followed.
The appellant argues that the sentencing order is deficient because the trial court did not state the specific reasons it gave the jury's sentencing recommendation the consideration it gave it, as required by Ex parte Taylor, 808 So.2d 1215 (Ala.2001). We agree. In Taylor, the Alabama Supreme Court stated:
"Under Alabama's capital-sentencing procedure, the trial judge must make specific written findings regarding the existence or nonexistence of each aggravating circumstance and each mitigating circumstance offered by the parties. § 13A-5-47(d), Ala.Code 1975. In making these findings, the trial judge must consider a jury's recommendation of life imprisonment without parole. See § 13A-5-47(e), Ala.Code 1975, (`in [weighing the aggravating and mitigating circumstances] the trial court shall consider the recommendation of the jury contained in its advisory verdict'). Construing subsection (e) together with subsection (d), we conclude that the trial judge must state specific reasons for giving the jury's recommendation the consideration he gave it."
(Footnote omitted.) In this case, although the trial court indicated that it had "given due consideration to the jury's recommendation," (C.R. 126), it did not state the specific reasons it gave the jury's recommendation the consideration it gave it. Accordingly, we remand this case to the trial court with instructions that that court amend its sentencing order to comply with the requirements of Taylor, as set forth above. The trial court shall take all necessary action to see that the circuit clerk makes due return to this court at the earliest possible time and within 42 days after the release of this opinion.
REMANDED WITH INSTRUCTIONS.
McMILLAN, P.J., and COBB, SHAW, and WISE, JJ., concur.

On Return to Remand
BASCHAB, Judge.
The appellant, Jeffrey Lee, was convicted of two counts of capital murder for the killings of Jimmy Ellis and Elaine Thompson. The murders were made capital because the appellant committed them during the course of a robbery or an attempted robbery. See § 13A-5-40(a)(2), Ala.Code 1975. He was also convicted of an additional count of capital murder, pursuant to § 13A-5-40(a)(10), Ala.Code 1975, because he killed Jimmy Ellis and Elaine Thompson by one act or pursuant to one scheme or course of conduct. Finally, he was convicted of attempting to murder Helen King. See §§ 13A-6-2 and 13A-4-2, Ala.Code 1975. After a sentencing hearing, the jury recommended, by a vote of 7 to 5, that the appellant be sentenced to imprisonment for life without the possibility of parole for the capital offenses. The trial court overrode the jury's recommendation and sentenced the appellant to death for the capital offenses. It also sentenced him to serve a term of life in prison on the attempted murder conviction. The appellant then appealed his convictions and sentences to this court.
On October 26, 2001, this court remanded this case to the trial court with instructions that the trial court amend its sentencing order to comply with the requirements of Ex parte Taylor, 808 So.2d 1215 (Ala.2001). On November 14, 2001, *809 the trial submitted its amended sentencing order. Furthermore, on several occasions since the original transcript was submitted to this court, the trial court has submitted supplemental records to this court.[1]
The appellant raises several issues on appeal that he did not raise at trial. Although the lack of an objection at trial will not bar our review of an issue in a case that involves the death penalty, it will weigh against any claim of prejudice the appellant may raise. See Ex parte Kennedy, 472 So.2d 1106 (Ala.1985). Rule 45A, Ala. R.App. P., provides:
"In all cases in which the death penalty has been imposed, the Court of Criminal Appeals shall notice any plain error or defect in the proceedings under review ... whenever such error has or probably has adversely affected the substantial right of the appellant."
"[This] plain-error exception to the contemporaneous-objection rule is to be `used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result.'" United States v. Young, 470 U.S. 1, 15, 105 S.Ct. 1038, 1046, 84 L.Ed.2d 1 (1985) (quoting United States v. Frady, 456 U.S. 152, 163 n.14, 102 S.Ct. 1584, 1592 n. 14, 71 L.Ed.2d 816 (1982)).
The trial court summarized the facts of the case as follows:
"On December 12, 1998, around noon Jeffrey Lee entered Jimmy's Pawnshop located in Orrville, Dallas County, Alabama, armed with a sawed off shotgun. Immediately upon entering the front door he shot Jimmy Ellis. After shooting Mr. Ellis he shot Elaine Thompson in the face. Continuing his shooting he shot Helen King and again shot Mr. Ellis. Mrs. Thompson and Mr. Ellis died as a result of shotgun blasts from Lee's gun. Mrs. King survived the shooting after lying motionless on the floor pretending to be dead. Lee attempted to take the cash register out of the store but was unsuccessful because of the way it was secured. He left the store and made his escape with his two co-defendants. His actions were captured by a surveillance video and he later confessed after being captured in a motel in Georgia. Lee had been to the pawnshop earlier in the day of the murder where he inquired about purchasing a ring. He left under the ruse of going to get money to pay for the ring but instead returned with a shotgun."
(R. 122.) Additional facts are included throughout this opinion as needed.

I.
The appellant's first argument is that the trial court improperly allowed the State's psychologist, Dr. Kathy Ronan, to testify "based on the inadmissible hearsay and other collateral sources, none of which were admitted into evidence." (Appellant's brief at p. 15.) Because he did not present this argument to the trial court, we review it for plain error. See Rule 45A, Ala. R.App. P.
During its case-in-chief, the defense called Dr. Donald Blanton,[2] a licensed professional counselor and a certified psychometrist,[3] to testify on the appellant's behalf. Dr. Blanton testified that he saw the appellant on two occasions; that he *810 administered a standard IQ test; that the test showed that the appellant's IQ was 67; and that that placed the appellant "in the middle range of mental retardation." (R. 311.) He also tested for organic disturbances, but did not find any; administered a reading, spelling, and math test that showed that the appellant was at the sixth grade level in reading, the second grade level in spelling, and the second grade level in math; and administered an oral psychological test from which he concluded that the appellant was not psychotic but was depressed as a result of his situation.
In rebuttal, the State called Dr. Ronan, a clinical psychologist at Taylor Hardin Secure Medical Facility. On July 8, 1999, pursuant to an order from the trial court, she evaluated the appellant's mental state at the time of the offenses and his competence to waive his Miranda[4] rights. She explained that, in conducting her evaluation, she followed protocol and obtained any information she could about the case and the appellant's background from both the defense and the prosecution. Based on her evaluation, she concluded "that there was no mental illness or mental retardation that would have impaired his understanding of right or wrong during the time of questioning." (R. 332.)
Dr. Ronan testified that she administered a mental status examination and "some items from IQ tests" to screen for mental retardation, but explained that she "didn't give him the whole test because [she] didn't feel like he needed those, he was not mentally retarded, he was in the more low average range. The school records would suggest that he's even higher than that." (R. 334.) She also testified that she did not find any evidence that the appellant suffered from a mental disease or defect or that he was mentally retarded. She further testified that "you would really have to be looking at someone's IQ level that's much lower than the mentally retarded range before you're talking about someone who couldn't understand right from wrong." (R. 336.)
When the State asked her about Dr. Blanton's conclusions, she testified that she had read his report earlier that day and that she agreed with parts of it and disagreed with other parts of it. She also testified that the results of the intelligence and achievement tests Dr. Blanton administered were "quite low," "inconsistent with my original findings," and "inconsistent with the history of [the appellant's] academic performance." (R. 333.) She explained that there were two possible reasons for the inconsistency. First, it could have been caused by an adjustment reaction, such as depression, because of being incarcerated and facing serious charges. Second, it could have been caused by the appellant not doing his best in an attempt to malinger or to appear to be less capable than he actually is.
Dr. Ronan testified that her testing suggested that the appellant "probably was exaggerating" in some areas. (R. 334.) She stated that the appellant had exaggerated his psychiatric symptoms on a personality test she had administered. Also, a similar psychological test Dr. Blanton had administered had been invalidated, and she testified that she believed that that was "due to the exaggeration of the [appellant]." (R. 333.) Further, the appellant had given different reports about hallucinations to her and to a psychiatrist who had seen him in the jail after the offenses. After reading Dr. Blanton's report, she realized that the appellant had told him a third version or presentation of his history.
*811 The State also called Howard Mitchell, for whom the appellant had worked, and Van Smith, the appellant's high school principal. Mitchell testified that the appellant did not appear to be slow or mentally retarded. Smith testified that the appellant was initially a good student, that he was in the advanced track preparing for college, that he was never tested for special education, that his grades declined in the eleventh and twelfth grades, and that he passed the high school exit examination the first time he took it.
"The traditional rule in Alabama regarding expert testimony used to be that expert testimony based on the conclusions or opinions of others was not admissible. See Chinevere v. Cullman County, 503 So.2d 841 (Ala.1987). However, the Alabama Supreme Court modified that rule, allowing a medical expert to give his opinion based in part on the opinions of others. Nash v. Cosby, 574 So.2d 700 (Ala.1990). In Ex parte Wesley, 575 So.2d 127, 129 (Ala.1990), the Supreme Court clarified its holding in Nash and held that the information upon which an expert relies still must be in evidence. Most recently, in T.G.S. v. D.L.S., 608 So.2d 743 (Ala.Civ.App.1992), the Court of Civil Appeals quoted a special concurrence by Justice Houston regarding the Supreme Court's current position as to the admissibility of opinion testimony from expert witnesses:
"`"It is my understanding that an expert witness may give opinion testimony based upon facts of which he has personal knowledge; based upon opinions of others, if these are opinions of a type customarily relied upon by the expert in the practice of his profession; or based upon facts that are assumed in a hypothetical question. In any event, the facts known to the expert, the opinions of others of a type customarily relied upon by the expert in the practice of his profession, and the hypothesized facts must all be facts in evidence." W.S. v. T.W., 585 So.2d 26 (Ala.1991) (Houston, J., concurring).'
"T.G.S. v. D.L.S., 608 So.2d 743 (Ala.Civ.App.1992)."
Slaton v. State, 680 So.2d 879, 890 (Ala.Crim.App.1995), aff'd, 680 So.2d 909 (Ala.1996).
In this case, Dr. Ronan testified that she followed protocol in obtaining and reviewing information about the case and the appellant's background from the prosecution and the defense. Also, she testified that she did not see Dr. Blanton's report until the day of the trial. Therefore, she did not use that report in evaluating the appellant. Further, she testified about what testing and evidence she relied on and how she reached her conclusions, and the defense thoroughly cross-examined her. Finally, other witnesses refuted Dr. Blanton's testimony that there was something wrong with the appellant. Therefore, we do not find that allowing Dr. Ronan to give opinion testimony rose to the level of plain error.
The appellant further argues that Dr. Ronan's reliance on information from an unidentified psychiatrist violated his right to cross-examine the witnesses against him. Because he did not present this argument to the trial court, we review it for plain error. See Rule 45A, Ala. R.App. P.
Dr. Ronan made only one brief reference to a statement the appellant made to a psychiatrist who saw him while he was in jail, and she used that as an example of the appellant exaggerating his psychological symptoms. However, she testified that her testing had already shown that he was exaggerating his psychological symptoms. Finally, the record does not indicate *812 whether she was relying on a report that psychiatrist made, personal conversations with the psychiatrist, or the appellant's statements to her about what he told that psychiatrist. Under these circumstances, we do not find that there was any plain error in this regard.

II.
The appellant's second argument is that the trial court improperly removed veniremember I.M. from the venire based on her opposition to the death penalty. Specifically, he contends that she "never expressed any opposition to the death penalty at any point during the voir dire." (Appellant's brief at p. 16.) Because he did not object on this ground at trial, we review this argument for plain error. See Rule 45A, Ala. R.App. P.
Initially, the transcript of the voir dire proceedings in this case included inconsistencies and errors. However, the court reporter reviewed the transcript and his notes and records and submitted a corrected transcript of the voir dire proceedings. In that corrected transcript, veniremember I.M. specifically indicated that she was so opposed to the death penalty that it would prevent her from serving on the jury and performing her duty in the case; indicated that she would consider only a sentence of imprisonment for life without the possibility of parole; stated, "I don't feel like I have that authority to end someone's life. I'm against it. That's all"; and indicated that she would not vote to impose the death penalty. (S.R. 125, 126, 135, 147.) Based on veniremember I.M.'s statements regarding her opposition to the death penalty, the trial court properly removed her from the venire for cause. See Perkins v. State, 808 So.2d 1041, 1071-73 (Ala.Crim.App.1999), aff'd, 808 So.2d 1143 (Ala.2001), vacated on other grounds, 536 U.S. 953, 122 S.Ct. 2653, 153 L.Ed.2d 830, on remand, 851 So.2d 453 (Ala.2002). Therefore, we do not find that there was any plain error in this regard.

III.
The appellant's third argument is that the trial court improperly denied his motion pursuant to Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), after the State used all of its peremptory strikes against black veniremembers.[5] After the jury was struck, but before it was sworn, the defense made a Batson motion, and the trial court required the prosecutor to state his reasons for exercising his peremptory strikes. Thereafter, the following occurred:
"[PROSECUTOR:] Most of the strikes the State has made in this case are based on the opposition of jurors to the death penalty, and we're trying a death penalty case.... [A]s to strike number 139, [D.M.], [he] has a general opposition to the death penalty, and does have a bit of an arrest record.
"The next strike was number 194, [A.S.,] who has an arrest record of some note. Number 88 was the next strike, [D.G.]no, [J.H.], he opposed the death penalty. Didn't want to answer questions about it, does have an arrest record. Our number 17 was strike number four.
"....

*813 "... [A.B.] opposed to the death penalty. Strike number five was number 56, [J.E.]. Opposed to the death penalty. Strike number six was juror number 100, [J.H.], opposed to the death penalty. Strike number seven was number 23, [M.B.], opposed to the death penalty. Strike number eight was juror number five, [S.B.]. Opposed to the death penalty. Strike number nine was [Q.A.], juror number one. He has knowledge of the defendant. Knew his family. Very uncomfortable about it. Strike number 10 was juror number 149, [O.M.]. Opposed to the death penalty. Didn't want to serve. Very uncooperative about the questions I asked. Strike number 11 was 126 [M.K.]. Opposed to the death penalty. Strike number 12, number 171, [G.P.], opposed to the death penalty. Strike number 13 was 191, [V.S.]. [She] was generally opposed to the death penalty. Has been involved in an incident where her spouse was charged with a drug offense and been found not guilty, and she was involved in some type of altercation with somebody. Strike number 14 was 155, [J.M.]. Opposed to the death penalty. Strike number 15, was number 123, [T.J.]. Opposed to the death penalty. Strike number 16 was 105, [E.H.]. Opposed to the death penalty. Strike number 17 was 246, [J.W.]. Opposed to the death penalty. Strike number 18 was 146, [M.M.]. Opposed to the death penalty. Strike number 19 was number 86, [D.G.]. Family member involved and convicted of a property crime. Opposed to the death penalty. Very uncooperative about answers. He had to be struck. Number 20 was number 57, [A.E.]. Opposed to the death penalty. Very cooperative about the answer. Our final strike was number 213, [K.S.]. Child support hearing this week. Wanted to be off for that. I only assume we're prosecuting same. Struck him for that reason."
(S.R. 188-90.)

A.
"In Batson, the United States Supreme Court held that the prosecution violates equal protection when it peremptorily strikes `potential jurors [from the venire] solely on account of their race or on the assumption that black jurors as a group will be unable impartially to consider the State's case against a black defendant.' 476 U.S. at 89, 106 S.Ct. at 1719. After the appellant makes a timely Batson motion and establishes a prima facie showing of discrimination, the burden shifts to the state to provide a race-neutral reason for each strike of a minority veniremember. See, e.g., Ex parte Bird, 594 So.2d 676 (Ala.1991). We will reverse the circuit court's ruling on the Batson motion only if it is `clearly erroneous.' Jackson v. State, 549 So.2d 616 (Ala.Cr.App.1989)."
Cooper v. State, 611 So.2d 460, 463 (Ala.Crim.App.1992).
As the prosecutor stated, most of the State's strikes were based solely on veniremembers' opposition to the death penalty.
"`Although a juror's reservations about the death penalty may not be sufficient for a challenge for cause, his view may constitute a reasonable explanation for the exercise of a peremptory strike.' Johnson v. State, 620 So.2d 679, 696 (Ala.Cr.App.1992), reversed on other grounds, 620 So.2d 709 (Ala.1993), on remand, 620 So.2d 714 (Ala.Cr.App.), cert. denied, 510 U.S. 905, 114 S.Ct. 285, 126 L.Ed.2d 235 (1993)."
Dallas v. State, 711 So.2d 1101, 1104 (Ala.Crim.App.1997), aff'd, 711 So.2d 1114 (Ala.1998). Therefore, the prosecutor's strikes *814 of veniremembers 17, 56, 100, 23, 5, 126, 171, 155, 123, 105, 246, 146, and 57 based on their opposition to the death penalty were race-neutral.
The prosecutor stated that he struck veniremember 194 because of her arrest record. This court has held that a veniremember's arrest record is a race-neutral reason for exercising a peremptory strike. See Della-Calce v. State, 654 So.2d 54 (Ala.Crim.App.1994); Strong v. State, 538 So.2d 815 (Ala.Crim.App.1988). Therefore, the prosecutor's strike of veniremember 194 based on her arrest record was race-neutral.
The prosecutor stated that he struck some veniremembers because they were uncooperative and did not want to answer questions, because they did not want to serve, and/or because they or members of their family had been involved in some type of crime.
"This court has held that lack of response by or participation of veniremembers is a valid race-neutral reason for striking a prospective juror. Allen v. State, 659 So.2d 135, 146-47 (Ala.Cr.App.1994)."
Macon v. State, 659 So.2d 221, 223 (Ala.Crim.App.1994). Also, "[b]oth prior criminal activity and a veniremember's desire not to serve on the jury have been held to be race-neutral reasons for strikes." Lewis v. State, 659 So.2d 183, 186 (Ala.Crim.App.1994). Finally,
"`[s]triking the relative of a person who has been convicted of a crime is racially neutral. Scott v. State, 599 So.2d 1222 (Ala.Crim.App.1992), cert. denied, Ex parte Scott, 599 So.2d 1229 (Ala.1992); Powell [v. State, 548 So.2d 590 (Ala.Crim.App.1988)]; Currin [v. State, 535 So.2d 221 (Ala.Crim.App.1988)].'
"Ex parte McNair, 653 So.2d 353, 356 (Ala.1994), cert. denied, [513] U.S. [1159], 115 S.Ct. 1121, 130 L.Ed.2d 1084 (1995)."
Ex parte Brown, 686 So.2d 409, 418-19 (Ala.1996).
The prosecutor stated that he struck veniremember 139 based on his opposition to the death penalty and his arrest record; that he struck veniremember 88 because of his opposition to the death penalty, because he did not want to answer questions about it, and because he had an arrest record; that he struck veniremember 149 because she was opposed to the death penalty, because she did not want to serve, and because she was uncooperative about the questions he asked; that he struck veniremember 191 because of her general opposition to the death penalty, because her husband had been involved in a crime and found not guilty, and because she had been in an altercation; and that he struck veniremember 86 because a family member had been convicted of a property crime, because he was opposed to the death penalty, and because he was uncooperative about answering questions. For the various reasons set forth above, the prosecutor's strikes of veniremembers 139, 88, 149, 191, and 86 were race-neutral.
The prosecutor stated that he struck veniremember 1 because he knew the appellant and his family and because he was very uncomfortable about it. "The strike of a potential juror because he knew the appellant or the appellant's family is a valid race-neutral reason that does not violate Batson v. Kentucky, supra. Brown v. State, 623 So.2d 416 (Ala.Cr.App.1993); Williams v. State, 620 So.2d 82 (Ala.Cr.App.1992)." Carroll v. State, 701 So.2d 47, 52 (Ala.Crim.App.1996). Therefore, the prosecutor's strike of veniremember 1 was race-neutral.
*815 Finally, the prosecutor stated that he struck veniremember 213 because he had a child support hearing that week and because he assumed the district attorney's office was prosecuting the case. However, veniremember 213 was an alternate juror in this case, and he ultimately served on the jury because one of the other jurors was not present when the trial started. (R. 191, 379.) Therefore, the appellant's arguments[6] concerning the strike of veniremember 213 are now moot.

B.
The appellant also argues that the State's reasons for its strikes were pretextual. However, at trial, he challenged only the reasons for striking veniremember 213, and that challenge was rendered moot when that veniremember, who had been an alternate, became a juror. Therefore, we review his remaining challenges for plain error. See Rule 45A, Ala. R.App. P.

i.
First, the appellant contends that the State engaged in disparate treatment because it did not strike veniremember M.P., a white female, even though it had previously challenged her for cause based on her opposition to the death penalty. During the voir dire proceedings, veniremember M.P. indicated that she could consider both the death penalty and imprisonment for life without the possibility of parole. (S.R. 101-02.) Subsequently, the prosecutor challenged her for cause, stating, "[A]ccording to our notes, she said she could only do life without." (S.R. 183.) However, the trial court corrected the prosecutor, stating, "I didn't have that," and denied the challenge for cause. (S.R. 183.)
Nevertheless, the appellant contends that veniremember M.P., who was white, was similarly situated to veniremembers J.M. and D.G., who were black and who were struck by the State based on their opposition to the death penalty. Specifically, he contends that veniremember J.M.'s and D.G.'s "imagined opposition to the death penalty is disputed by the record." (Appellant's brief at p. 22.)
During the voir dire proceedings, veniremember J.M. initially indicated that the death penalty was "a proper thing, but then it would be between maybe life without parole." (S.R. 102.) However, she subsequently indicated that she could "weigh the evidence and make a decision based on the evidence on all the different choices," but added that "realizing I wasn't in favor of the death penalty because people were innocent" and "the reason I would say not the death penalty is because if he was innocent and he killed, if he did, and you found him guilty, it wouldn't do any good to kill him, because like I say, he would be gone and the other people, they suffer now for no purpose." (S.R. 116, 117.) Therefore, veniremembers J.M. and M.P. were not similarly situated.
During the voir dire proceedings, veniremember D.G. indicated that he would listen to the evidence and consider imprisonment for life without the possibility of parole and the death penalty. (S.R. 129-30.) It appears that the prosecutor was simply mistaken about veniremember D.G.'s views about the death penalty. "`"A prosecutor may strike from mistake, as long as the assumptions involved are based on an honest belief and are racially neutral."' Reese v. City of Dothan, 642 So.2d 511 (Ala.Cr.App.1993)." McElemore *816 v. State, 798 So.2d 693, 698 (Ala.Crim.App.2000). The record does not indicate that the prosecutor's reason was not based on an honest belief. Moreover, the State also indicated that it struck veniremember D.G. because a family member had been convicted of a property crime. For the reasons set forth above, that reason was race-neutral. Therefore, veniremembers D.G. and M.P. were not similarly situated.
We do not find that there was any disparate treatment with respect to veniremembers M.P., J.M., and D.G. Therefore, we do not find that there was any plain error in this regard.

ii.
Second, the appellant contends that the State improperly struck veniremembers based on their arrest records. Specifically, he asserts that the "allegations of criminal histories [were] not supported by the record, and not clarified on voir dire." (Appellant's brief at p. 24.) However, the record indicates that the prosecutor had documentation regarding the veniremembers' criminal history. Also, before the parties made challenges for cause, the State gave the defense "a copy of the criminal history on the venire." (S.R. 181.) Finally, the trial court had previously assured defense counsel that it would allow him time to review the documentation before striking the jury. Therefore, the appellant's argument is not supported by the record, and we do not find that there was any plain error in this regard.

iii.
Third, the appellant contends that the State improperly struck veniremembers J.H., O.M., and D.G. based on their demeanor. As set forth above, strikes based on a veniremember's demeanor or reluctance to answer questions are race-neutral. Further, the appellant did not dispute the prosecutor's assertions about the demeanor of these veniremembers at trial. Finally, even if the reasons were not appropriate, the prosecutor also gave other race-neutral reasons for striking each of these veniremembers. Therefore, we do not find that there was any plain error in this regard.

iv.
Fourth, the appellant contends that the State engaged in disparate treatment of white and black veniremembers who had similar feelings about the death penalty. Specifically, he asserts that it did not strike veniremember M.S., a white female, but it struck veniremember J.M., a black female.
During the voir dire proceedings, veniremember M.S. initially stated, "I don't think [the death penalty is] not proper, but I would rather do life without parole." (S.R. 102.) However, subsequently, she indicated that she would be able to listen to the evidence and vote for either the death penalty or imprisonment for life without the possibility of parole based on the evidence. (S.R. 116.)
During the voir dire proceedings, veniremember J.M. initially indicated that the death penalty was "a proper thing, but then it would be between maybe life without parole." (S.R. 102.) However, she subsequently indicated that she could "weigh the evidence and make a decision based on the evidence on all the different choices," but added that "realizing I wasn't in favor of the death penalty because people were innocent" and "the reason I would say not the death penalty is because if he was innocent and he killed, if he did, and you found him guilty, it wouldn't do any good to kill him, because like I say, he would be gone and the other people, they suffer now for no purpose." (S.R. 116, 117.)
Clearly, veniremembers M.S. and J.M. were not similarly situated. Although she *817 first said she would prefer to vote for imprisonment for life without the possibility of parole, veniremember M.S. ultimately stated that she would also consider the death penalty and would vote based on the evidence presented. Oppositely, although veniremember J.M. indicated that she could weigh the evidence and make a decision based on the evidence presented, she ultimately stated that she "would say not the death penalty ... because if he was innocent and he killed, if he did, and you found him guilty, it wouldn't do any good to kill him, because like I say, he would be gone and the other people, they suffer now for no purpose." (S.R. 117.) Therefore, because veniremembers M.S. and J.M. did not express similar feelings about the death penalty, we do not find any plain error in this regard.

v.
Fifth, the appellant contends that the State engaged in disparate treatment of white and black veniremembers who had been accused of or charged with a property crime or who had family members or friends who had. Specifically, he asserts that it did not strike veniremember E.E., a white male, but it struck veniremember D.G., a black male. However, the defense used its twelfth peremptory strike against veniremember E.E., and the State used its nineteenth strike against veniremember D.G. Because the defense had long since struck veniremember E.E. when the State struck veniremember D.G., we do not find that there was any plain error in this regard.

IV.
The appellant's fourth argument is that the State improperly obtained and used evidence about his psychiatric condition against him at trial. Specifically, he contends 1) that Dr. Ronan improperly used statements he made to her and to an unidentified psychiatrist at the jail to support her conclusions that he did not suffer from any mental disease or defect and that he was faking a psychiatric condition; 2) that he was not advised of his Miranda rights and was not told that his statements could be used against him; and 3) that the State used Dr. Ronan's testimony to show his untruthfulness and bad character, in violation of Rule 404, Ala. R. Evid. Because he did not present these arguments to the trial court, we review them for plain error. See Rule 45A, Ala. R.App. P.
Rule 11.2, Ala. R.Crim. P., provides, in pertinent part:
"(a) Motions.
"....
"(2) Mental Condition at Time of Offense. If the defendant has timely raised a defense of `not guilty by reason of mental disease or defect' either by the entry of a plea or by filing a pre-trial motion pursuant to Rule 15, the court on its own motion may order, or the defendant, the defendant's attorney, or the district attorney may move for an examination into the defendant's mental condition at the time of the offense.
"(b) Admissibility of Mental Examinations.
"....
"(2) The results of mental examinations made pursuant to subsection (a)(2) of this rule and the results of similar examinations regarding the defendant's mental condition at the time of the offense conducted pursuant to Rule 11.4 shall be admissible in evidence on the issue of the defendant's mental condition at the time of the offense only if the defendant has not subsequently withdrawn his or her plea of not guilty by reason of mental disease or defect. Whether the examination is conducted with or without the defendant's consent, no statement made by the defendant *818 during the course of the examination, no testimony by an examining psychiatrist or psychologist based upon such a statement, and no other evidence directly derived from the defendant's statement shall be admitted against the defendant in any criminal proceeding, except on an issue respecting mental condition on which the defendant has testified."
In his brief to this court, the appellant contends that Dr. Ronan's testimony undermined his defense that he did not intentionally shoot the victims. However, at trial, he repeatedly admitted that he shot the victims, but contended that he did so because something was wrong with him. In his opening statement, defense counsel stated:
"Please the court. Good morning, everybody. As I talked to you yesterday, you remember I asked if anybody had any family member or friend that had a mental illness?
"Ladies and gentlemen, this is what this case is about, a mentally retarded person. One date went to a pawnshop with a group ofwith a group. Had been taking drugs, smoking marijuana or something. He, along with some others, he goes to the pawnshop and he goes in. When he goes in, he shoots Jimmy Ellis. The prosecutor has indicated that this was an elaborate plan. There's going to be a robbery and all that. But I want you to listen to the evidence and see the evidence. Mr. Ellis had $900, roughly $900 in his pocket when the pathologist examined him. He still had the $900 in his pocket.
"Mrs. Thompson, she has a roll of money laying on her back. There's a safe that's in the back. Nothing was taken from this safe. No jewelry was taken. There's a lot of things he didn't take either. There were several things. But anyway throughout this trial, I want you to think about the person that's mentally retarded and what they would do in this kind of situation.
"After the defendant left, he leaves the shotgun on the table. Think about that. He takes no money, he leaves the shotgun on the table and he leaves. There's some facts undisputable and there are facts that are disputable. The main fact that's disputable is how did this happen? There's going to be testimony when Mr. Ellis was shot, the first shot was an accident. That the shotgun just went off. And again, keep in mind about mental retardation.
"You take a look at the defendant over there. Take a good look at him throughout this trial, as this trial is going on. There's going to be a doctor testifying about his mental capacity, about his low IQ, about the fact that a lot of his ability to comprehend is on a second grade level. All of this is going to come out. I want you to pay attention to that.
"Second, somebody with the mental capacity of a second grade versus someone who has a mental capacity of an adult. How would they react to certain situations? If somebody gets shot, would they panic and do all kinds of other crazy things, or would they act normal? Would they leave a gun there after they've shot a person? You're going to see pictures when you first walk into this pawnshop. There's a big television where you can see yourself. You're being videotaped. Why would a person shoot? Why would a person shoot people when they know they're on video? They're being videotaped. Again, keep in mind about the mental retardation throughout the trial.
"Would a person that robbed the place leave $900 in the pocket of the person he just shot? Why would you leave the *819 money in the safe, and why would you leave and not take any jewelry? Just keep in mind throughout the trial about the mental retardation, and I think you'll have the explanation of what happened on that particular day.
"I think after you heard all the evidence, I think you're going to come back with a verdict of murder. Not capital murder, but murder.
"Nobody is going to get up here and argue that Jeffrey shouldn't be punished. But keep in mind about the mental retardation. So we think after you've heard all the evidence and everything that will be your decision."
(R. 200-02.) Subsequently, during his cross-examination of the appellant's sister's boyfriend, defense counsel attempted to elicit testimony that the appellant was crazy and slow. Finally, during his closing argument, defense counsel stated:
"[W]e all know what happened here. [The appellant] here, he murdered two people. There's no question about that.
"....
"... I don't know when [the appellant] started having experienced some mental retardation as a child. I don't know if that happens because of drugs later on in life or during his childhood or something physical that caused it. I don't know. But I do know that Dr. Blanton tested him recently. This wasn't no five years ago or 10 years ago, this was recently.
"....
"Remember again we all know what the truth is, [the appellant] murdered Mr. Ellis and Mrs. Thompson. No question about that....
"...
"... But remember what I told you at the very beginning? When you're thinking about this case, mental retardation and I don't know whether all the jurors can see [the appellant], but it doesn't take a rocket scientist to see there's something wrong with him. Look at him. He's not going to hide, just look at him. You can tell there's something wrong with him.
"And Dr. Ronan came in here and said he should have reacted like a normal person. Is a normal person going to do what [the appellant] did in there?
"The question, of course, the question of whether it was an accident or not, when he pointed the shotgun, did it go off or did he mean for it to go off, or did it accidentally go off? I don't know. That's a question I don't think we're going to sufficiently know what's in the mind.
"I want you to think about this. We don't know what a person who is 23 in a seven year old body, a 23 year old body trapped with a seven year old mind what their thinking is. We don't know that.
"....
"... You all heard what Dr. Blanton testified to about his skills. Second grade.... A person with that kind of mind going to go into a pawnshop and react just like you and me? We got to use our common sense here.... When you go back in the jury room, you just don't suspend your common sense. You got a combination of drugs and a mentally retarded person is not going to react the same way you and I would react. Just not going to do it.
"This whole crime, it does not make sense. How do they do what they do? Just they're trying to be tough, you know? You see a lot of this these days. They're trying to be tough. This thing goes beyond trying to be tough. It makes no sense. The events that went on in there, no sense. If you're going to rob right here, and there are two televisions *820 right there, and I'm looking at myself, why would I shoot anybody? It makes no sense. Unless, of course, something is not quite right upstairs.
"....
"... [Y]ou're going to be instructed in some of these cases with something less than murder, something less than manslaughter. It's conceivable that some of y'all might believe this is a manslaughter case.
"We're not saying that. What we're saying is, it's a murder case. Murder. Not capital murder. It is not a capital murder case, given all the surrounding circumstances. Just think about all the crazy things that happened inside that pawnshop, it's not a capital murder case. Something else is wrong with [the appellant].
"We're not even going to argue the point about it's anything less than murder. I could make that argument, but I'm not going to make it. I'm not going to try to pull the wool over anybody's eyes here. This is murder. This is murder.
"That's what we're going to ask you to come back with, is murder....
"We sure appreciate your time. But again, while you think about it, I want y'all to look at [the appellant] over there. Take a look at him. I think y'all can come to the same conclusion, there's something wrong with [the appellant]. Thank you."
(R. 355-70.)
Even though the appellant ostensibly abandoned his plea that he was not guilty by reason of mental disease or defect, he clearly based his defense on a contention that there was something wrong with his mental condition. Therefore, Dr. Ronan's testimony about the results of her mental examination was admissible to refute his defense that there was something wrong with him, to rebut Dr. Blanton's testimony that he was psychotic and mentally retarded, and to explain the inconsistencies between her conclusions and Dr. Blanton's conclusions. Furthermore, even if the appellant was not advised of his Miranda rights and was not told that his statements could be used against him, Dr. Ronan's testimony about statements the appellant made was admissible pursuant to Rule 11.2(b)(2), Ala. R.Crim. P., because those statements were relevant and material to support her conclusion that he did not suffer from any mental disease or defect and that he was not mentally retarded. See Williams v. State, 710 So.2d 1276, 1299-1300 (Ala.Crim.App.1996), aff'd, 710 So.2d 1350 (Ala.1997). Finally, the record does not support the assertion that the State was trying to use Dr. Ronan's testimony to malign the appellant's character. Rather, it shows that the State used the testimony to rebut Dr. Blanton's testimony and to explain the inconsistencies between his conclusions and her conclusions. Therefore, we do not find that there was any plain error in this regard.

V.
The appellant's fifth argument is that numerous instances of prosecutorial misconduct deprived him of a fair trial and an accurate sentence. Throughout the trial, the trial court repeatedly instructed the jury that statements made by the attorneys were not evidence, that the jury was required to base its decision upon the evidence presented during the proceedings, and that the jury was not to base its decision on passion, prejudice, or any other arbitrary factor. We presume that the jury followed the trial court's instructions. See Taylor v. State, 666 So.2d 36 (Ala.Crim.App.1994), aff'd, 666 So.2d 73 (Ala.1995). In judging a prosecutor's closing *821 argument, the standard is whether the argument "`so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" Darden v. Wainwright, 477 U.S. 168, 181, 106 S.Ct. 2464, 2471, 91 L.Ed.2d 144 (1986) (quoting Donnelly v. DeChristoforo, 416 U.S. 637, 643, 94 S.Ct. 1868, 1871, 40 L.Ed.2d 431 (1974)).
"In reviewing allegedly improper prosecutorial comments, conduct, and questioning of witnesses, the task of this Court is to consider their impact in the context of the particular trial, and not to view the allegedly improper acts in the abstract. Whitlow v. State, 509 So.2d 252, 256 (Ala.Cr.App.1987); Wysinger v. State, 448 So.2d 435, 438 (Ala.Cr.App.1983); Carpenter v. State, 404 So.2d 89, 97 (Ala.Cr.App.1980), cert. denied, 404 So.2d 100 (Ala.1981). Moreover, this Court has also held that statements of counsel in argument to the jury must be viewed as delivered in the heat of debate; such statements are usually valued by the jury at their true worth and are not expected to become factors in the formation of the verdict. Orr v. State, 462 So.2d 1013, 1016 (Ala.Cr.App.1984); Sanders v. State, 426 So.2d 497, 509 (Ala.Cr.App.1982)."
Bankhead v. State, 585 So.2d 97, 106-07 (Ala.Crim.App.1989), aff'd in relevant part, 585 So.2d 112, 127 (Ala.1991), rev'd on other grounds, 625 So.2d 1146 (Ala.1993). Finally,
"`[d]uring closing argument, the prosecutor, as well as defense counsel, has a right to present his impressions from the evidence, if reasonable, and may argue every legitimate inference.' Rutledge v. State, 523 So.2d 1087, 1100 (Ala.Cr.App.1987), rev'd on other grounds, 523 So.2d 1118 (Ala.1988) (citation omitted). Wide discretion is allowed the trial court in regulating the arguments of counsel. Racine v. State, 290 Ala. 225, 275 So.2d 655 (1973). `In evaluating allegedly prejudicial remarks by the prosecutor in closing argument, ... each case must be judged on its own merits,' Hooks v. State, 534 So.2d 329, 354 (Ala.Cr.App.1987), aff'd, 534 So.2d 371 (Ala.1988), cert. denied, 488 U.S. 1050, 109 S.Ct. 883, 102 L.Ed.2d 1005 (1989) (citations omitted) (quoting Barnett v. State, 52 Ala.App. 260, 264, 291 So.2d 353, 357 (1974)), and the remarks must be evaluated in the context of the whole trial, Duren v. State, 590 So.2d 360 (Ala.Cr.App.1990), aff'd, 590 So.2d 369 (Ala.1991). `In order to constitute reversible error, improper argument must be pertinent to the issues at trial or its natural tendency must be to influence the finding of the jury.' Mitchell v. State, 480 So.2d 1254, 1257-58 (Ala.Cr.App.1985) (citations omitted). `To justify reversal because of an attorney's argument to the jury, this court must conclude that substantial prejudice has resulted.' Twilley v. State, 472 So.2d 1130, 1139 (Ala.Cr.App.1985) (citations omitted)."
Coral v. State, 628 So.2d 954, 985 (Ala.Crim.App.1992), aff'd, 628 So.2d 1004 (Ala.1993).

A.
First, the appellant contends that the prosecutor improperly injected his views on his guilt and other critical issues. Specifically, he alleges that, during his guilt-phase closing arguments, the prosecutor "repeatedly told the jury what he thought about the evidence and pointed out what he believed to be the most compelling pieces of evidence against [him]." (Appellant's brief at p. 40.) Because he did not object at trial to the comments about which he now complains, we review them for plain error. See Rule 45A, Ala. R.App. P. The first instance about which the appellant complains occurred during *822 the prosecutor's initial closing argument, when the prosecutor stated:
"There was, I thought, some riveting testimony given by Mrs. King as she survived this ordeal."
(R. 348) (emphasis added). In the second instance about which the appellant complains, the prosecutor stated:
"I thought the little piece of evidence from the gentleman that goes with his sister about Friday night, told a lot about why this happened. Group of the guys were up there at the community and they got this gun out and they were talking about what a man it would take to shoot this gun and they shot it. I think that's got a lot do with that. That and it's a pawnshop down in Orrville, out in the boonies, hard for anybody to get to. Law can't get there very quick. Got an alarm, but it will take them awhile. It's out in the woods. Kind of like the bank down there."
(R. 349) (emphasis added). In the third instance about which the appellant complains, the prosecutor stated:
"The Court will also charge you that you could consider manslaughter. That the defendant was acting in some reckless abandon with this gun and it just went off all by itself.
"I thought the young lady from the forensic laboratory pretty well took care of that theory. This gun, its stock has been cut off and its barrel has been cut off for a very obvious reason, it can be carried hidden and it scatters pretty quickly. It's a pretty dangerous offensive weapon designed to take human beings out. It works. It has a six pound trigger pull."
(R. 352) (emphasis added). In the fourth instance about which the appellant complains, the prosecutor stated:
"Count 3 is killing two or more people in the course of one conduct, one action. That is, if he went into the store with the intent to rob these people, that while he was in there doing that, he killed two of them.
"Now, if you find that he accidentally shot Jimmy Ellis, then, of course, you couldn't find that he intentionally killed two or more people, if you find this was sort of an accident. I don't think in reality using common sense God gives you on these facts that it is at all relevant.
"Nothing accidentally took place in this case."
(R. 353-54) (emphasis added). In the fifth instance about which the appellant complains, the prosecutor stated:
"You can also consider, the Judge will charge you, assault second degree. That he didn't intend to kill her, he just caused her pain. You can consider that. I think that is not borne out by the evidence at all. Sure, she suffered pain, he's guilty as to that. But he's guilty of a whole lot more than that. He tried to kill that woman. If she hadn't got up off the floor, picked up that telephone, shut the door, she wouldn't be sitting over there today."
(R. 355) (emphasis added). Finally, during the prosecutor's rebuttal closing argument, the following occurred:
"If in fact you believe that the facts are that he killed these two people during the course of a robbery, then he's guilty of murder during robbery. That's the choice you have and that's the only choice you could reach. I believe that's the only choice you can reach on these facts."
(R. 376) (emphasis added).
"[W]e view those comments that the prosecutor prefaced with `I think,' `I believe,' `I feel,' `I am satisfied,' and `I have no doubt,' as expressing his reasonable *823 impressions from the evidence. The prosecutor was allowed to argue every legitimate inference from the evidence, and the trial court was afforded wide discretion in regulating his comments. We note, however, that even if these comments were to be viewed as expressions of the prosecutor's personal opinions and, thus, as `crossing the line' of permissible argument, they, nonetheless, would not constitute reversible error. There is no fixed standard for determining whether a prosecutor's comments so prejudiced the factfinding process as to require a new trial."
Ex parte Rieber, 663 So.2d 999, 1014 (Ala.1995). After reviewing the prosecutor's comments in the context of the entire closing arguments, we conclude that they were simply permissible comments on the evidence. Accordingly, we do not find that there was any plain error in this regard.

B.
Second, the appellant contends that the prosecutor improperly commented on his decision not to testify. During his initial guilt-phase closing argument, the prosecutor stated:
"Why a man thinks he's got to do that, why he feels he has to kill these people on this occasion, I can't get inside that kind of mind. Almighty dollar drives people hard. The macho all male hard-charging, I-got-the-gun and I'm-going-to-rule has something to do with that thinking."
(R. 348-49) (emphasis added). Because the appellant did not object at trial to the comment about which he now complains, we review the comment for plain error. See Rule 45A, Ala. R.App. P.
"`[O]nce a defendant chooses not to testify at his trial the exercise of that choice is not subject to comment by the prosecution.' Wherry v. State, 402 So.2d 1130, 1133 (Ala.Cr.App.1981). `In determining if a prosecutorial remark impairs the integrity of the defendant's right not to testify the test is whether the defense can show that the remark[, given the context in which it was made,] was intended to comment on the defendant's silence or was of such character that a jury would naturally and necessarily construe it as a comment on the defendant's silence.' United States v. LeQuire, 943 F.2d 1554, 1565 (11th Cir.1991), cert. denied, 505 U.S. 1223, 112 S.Ct. 3037, 120 L.Ed.2d 906 (1992)."
Ex parte Davis, 718 So.2d 1166, 1173 (Ala.1998).
When viewed in context, the prosecutor's argument was an obvious comment on the appellant's motive for committing the murders. Furthermore, it was not "`of such character that a jury would naturally and necessarily construe it as a comment on the defendant's silence.'" Id. Accordingly, the prosecutor's argument did not rise to the level of plain error.

C.
Third, the appellant contends that the prosecutor "impugned [his] theory of the case and denigrated [his] right to consideration of lesser included offenses." (Appellant's brief at p. 44.) However, he did not object to the comments about which he now complains during the trial. Therefore, we review them for plain error. See Rule 45A, Ala. R.App. P.
During his initial guilt-phase closing argument, the prosecutor stated:
"There are four counts in the indictment. In my judgment, it's confusing, especially when the Court adds the lesser included offenses it must. Gets jumbled up with all these terms and names. The central point, as you go through each count, the central point is, and to *824 go there to rob these people, did he intentionally kill them?"
(R. 350) (emphasis added). The appellant asserts that the comment implied "that the jury should disregard the lesser included instructions as mere technicalities that the judge was required to fulfill." (Appellant's brief at p. 45.) However, the prosecutor did not suggest at any time that the trial court's actions in instructing the jury on lesser included offenses was a mere technicality or that the jury should not consider the lesser included offenses. In fact, the prosecutor subsequently discussed each of the lesser included offenses in detail. When viewed in the context of the prosecutor's entire guilt-phase closing argument, it appears that the prosecutor was explaining the complexities of the charges involved and attempting to focus the jury's attention on the question of whether the appellant committed the offenses of capital murder. Therefore, we do not find that there was any plain error in this regard.
The second instance about which the appellant claims occurred during the prosecutor's guilt-phase rebuttal closing argument. At the end of his closing argument, defense counsel stated:
"But again, while you think about it, I want y'all to look at Jeffrey over there. Take a look at him. I think y'all can come to the same conclusion, there's something wrong with Jeffrey. Thank you."
(R. 370.) Subsequently, during his rebuttal closing argument, the prosecutor stated:
"Something's wrong with Jeffrey. I agree. Something's wrong with Jeffrey because he's willing to take this shotgun and go down there and kill two or three people. He's ready to kill for money. There's something wrong with him. He's a stone cold killer? No, he's a pitiful fellow.
"I guess the defense attorney wants all of you to be psychiatrists. You're supposed to look over there and say, he's crazy. You've got to ignore what happened out there with Mrs. King. Forget about all that. Let's concentrate on Jeffrey.
"Jeffrey who has a physician up here to testify he's insane? We didn't hear that, did we? There's no evidence that he's insane or crazy or not responsible or diminished or suffering from mental disease or defect.
"No, sir; it's a play for sympathy. Y'all are supposed to say, okay, well now, maybe there's something I don't know. I'm supposed to be easy on him somehow or other. That's what you just heard.
"Ladies and gentlemen, we have to deal with the facts we have. Mr. Jackson has based his whole argument on one Donald Blanton. Donald Blanton got up here and said he thought he was retarded because he didn't testify well on the stand the test that he gave him. Blanton is not a doctor. He's not a physician. He has no degree in psychology or psychiatry as a medical doctor or a Ph.D. or psychologist.
"[DEFENSE COUNSEL]: Objection. He has a Ph.D., I'll be glad to concede that.
"THE COURT: Objection overruled.
"[PROSECUTOR:] He is no doctor, he's no medical doctor. He has no doctorate in psychology or psychiatry. He's a person who is licensed to give tests to people. His job, by the way at the University of Alabama Family Practice Center, is to train doctors and counsel with new doctors. He's not authorized to give any position about psychological and psychiatric problems or *825 opinions. He gave this man a test at the behest of his lawyers, a series of tests. He did poorly on the tests. Dr. Ronan said he did poorly on her tests. He was also evasive and trying to build a defense."
(R. 370-71) (emphasis added). After reviewing the prosecutor's statements in context, we find that they were permissible comments on the evidence and a reply in kind to defense counsel's closing argument. "`[A] prosecutor has the right to "reply in kind" to statements made by defense counsel in the defense's closing argument.' Ex parte Musgrove, 638 So.2d 1360, 1369 (Ala.1993), cert. denied, Rogers v. Alabama, [513] U.S. [845], 115 S.Ct. 136, 130 L.Ed.2d 78 (1994)." Ex parte Taylor, 666 So.2d 73, 88 (Ala.1995). Therefore, we do not find that there was any plain error in this regard.

D.
Fourth, the appellant contends that the prosecutor improperly argued that it was the jury's duty to convict him. However, he did not object at trial to the comments about which he now complains. Therefore, we review them for plain error. See Rule 45A, Ala. R.App. P.
In the first instance about which the appellant complains, the prosecutor stated:
"I say to you that is the facts in this case. The cold hard simple truth. You didn't ask to come sit in this chair. Drew your name out of the computer. Put you here to do you duty to the community, to serve. I know it's not one of you that wouldn't rather be doing something else. There's nothing fun about it. Your job is to take the law and what the law says and from that Jeffrey sets out to rob somebody and in the course of that he intentionally kills his victim. One and one is two. The charge is capital murder. Murder during robbery. That's the verdict that these facts provide for."
(R. 350) (emphasis added). In the second instance about which the appellant claims, the prosecutor stated:
"I wish I could remove from you the duty that's upon you to act as a juror to represent the community. It's your common sense."
(R. 355) (emphasis added). Also, during the prosecutor's rebuttal closing argument, the prosecutor stated:
"Ladies and gentlemen, if you consider this case in the light of all the facts that are before you, and using your God given common sense when you were put in this jury box, they didn't say you had to assume a new fancy role. You're the same person you were before you came to this case. You got just a lot more serious duty to perform. You use your common sense you came here with."
(R. 375) (emphasis added). Later, the prosecutor stated:
"The last charge is intent to kill Mrs. King. There's no question about that. No doubt he shot at her. She was hit. He said he was trying to kill the woman. The video shows he's shooting. We know there were four shots. Certainly that was the intent and purpose of taking a gun and pointing it at somebody that close and pulling the trigger would be that you would have to try to kill them. That's the only choice in this case. That's the only thing the facts leave you with.

"Nobody said it's going to be easy. Not that you're supposed to be happy about it, just supposed to do the duty imposed upon you."
(R. 376-77) (emphasis added.) In the final instance about which the appellant complains, the prosecutor stated:

*826 "There's nothing that is capable to erase all this or bring back a father, bring back a mother. Remove him from the life he's leading? You don't have that power. I don't have that power, the government doesn't have that power. We've got to deal with society we live in and the law that we must all live by. One of them is not allowing us to murder each other. You're not allowed to take the property of another. The law specifies what the crimes are. Your job is to decide what those facts show.
"Ladies and gentlemen, these facts show Jeffrey Lee around dinner time in December of 1998, committed intentional murder of two living human beings for the purpose of robbery. That's what happened. Those are the facts. That is your duty. Thank you very much."
(R. 378) (emphasis added).
Contrary to the appellant's assertion, the prosecutor did not inform the jurors that it was their duty to find him guilty. Rather, the prosecutor simply asked the jurors to do their duty, even though it was difficult; asked the jurors to use their common sense in performing their duty; and asked the jurors to return a verdict of guilty of capital murder and attempted murder. See Wilson v. State, 777 So.2d 856, 897 (Ala.Crim.App.1999), aff'd, 777 So.2d 935 (Ala.2000). Further, it appears that some of the comments about which the appellant complains were permissible comments on the evidence, arguments as to how the law should be applied to the evidence, and general appeals for law enforcement. A prosecutor may make a general appeal for law enforcement. See Freeman v. State, 776 So.2d 160 (Ala.Crim.App.1999), aff'd, 776 So.2d 203 (Ala.2000). "There is no impropriety in a prosecutor's appeal to the jury for justice and to properly perform its duty." Price v. State, 725 So.2d 1003, 1033 (Ala.Crim.App.1997), aff'd, 725 So.2d 1063 (Ala.1998). When viewed in the context of all of the guilt-phase closing arguments, we do not find that the prosecutor's comments "`so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" Darden, supra. Therefore, the prosecutor's statements did not rise to the level of plain error.

E.
Fifth, the appellant contends that, during his guilt-phase closing argument, the prosecutor argued facts that were not in evidence. Specifically, he asserts that "the prosecutor exhorted the jury to convict [him] of capital murder, by suggesting that there [were] hundreds of peoplewho did not speak up during the trialwho felt that [he] should be found guilty." (Appellant's brief at pp. 48-49.) Because he did not object to the prosecutor's statement, we review this argument for plain error. See Rule 45A, Ala. R.App. P.
During his guilt-phase closing argument, the prosecutor stated:
"I can only wish that I could communicate to you the feelings that so many people have about the senselessness of this shooting.

"I wish I could remove from you the duty that's upon you to act as a juror to represent the community. It's your common sense."
(R. 355) (emphasis added). Contrary to the appellant's assertion, the prosecutor did not imply that there were hundreds of people who felt that he should be found guilty. Rather, when viewed in context, his statement was a comment upon the nature of the crimes and a general appeal for law enforcement. As we stated previously, a prosecutor may make a general appeal for law enforcement. See Freeman, supra. Therefore, we do not find *827 that there was any plain error in this regard.

F.
Sixth, the appellant contends that the prosecutor improperly asked his own witnesses and veniremembers leading questions. Because he objected to only one of the instances about which he complains on appeal, we review the remaining instances for plain error. See Rule 45A, Ala. R.App. P.
We have reviewed the instances in which the appellant claims that the prosecutor asked leading questions, and we do not find that the prosecutor acted improperly. Therefore, we do not find that there was any error, much less plain error, in this regard.

G.
Seventh, the appellant contends that the prosecutor improperly vouched for his case and for the credibility of his witnesses. Because he did not object at trial to the statements about which he now complains, we review them for plain error. See Rule 45A, Ala. R.App. P.
The first instance about which the appellant complains occurred during the prosecutor's initial guilt-phase closing argument, when the prosecutor stated:
"Two things I think I need to touch on here before I sit down. In this case there is no question or argument or debate about the issue of insanity. Any defense in this area, any question about insanity, it's not something that's brought up. It's not an issue in this case. You'll not be charged to consider that because there's no evidence of that.
"The defendant is responsible based on all the charges, based on the law for what he did. Your job is to decide what did he do and apply the law to that."
(R. 350-51) (emphasis added). After reviewing the prosecutor's statement in context, we conclude that the prosecutor was not improperly vouching for his case. Rather, the prosecutor's statement was a permissible comment on the evidence. Therefore, we do not find that there was any plain error in this regard.
The second instance about which the appellant complains occurred during the prosecutor's guilt-phase rebuttal closing argument, when the prosecutor stated:
"Of course [a witness] wasn't sure about the car, couldn't identify anybody near the area. The purpose was that it verified, it backed up, it supported what was in that statement. And all the rant and raving from the defendant about [a law enforcement officer] in this statement, he took down what he told him.
"Now, if he wanted to write a statement that would be neat and nice and show tons of guilt by the Defendant and make it up, he could have done that, yes, I guess he could have unless he's a professional honest law enforcement person that's going to take what the man tells him.

"Sure there's a lot of things in there he doesn't think is true. But what's in that statement fits the facts as you know them. Everything that's in there fits what happened and it's a very reliable statement. That's why [the witness] was called. He did go change clothes before he went back in there."
(R. 377-78) (emphasis added). The prosecutor's statement did not amount to vouching for the officer's credibility. During his guilt-phase closing argument, defense counsel argued that the officer was the only person with the appellant when he made the statement; that the officer did not videotape or audiotape the statement; that the appellant was mentally retarded; that the jury did not know what the officer *828 wrote down; and that the jury did not know what the officer had told the appellant he was signing. Therefore, the prosecutor's comment was an appropriate reply-in-kind to defense counsel's arguments regarding the appellant's statement. Accordingly, we do not find that there was any plain error in this regard.

H.
Eighth, the appellant contends that the prosecutor misstated the law on intent during his guilt-phase closing arguments. Specifically, he asserts that the prosecutor shifted the burden of proof on the element of intent and "led [the jury] to believe that simply because the victims were dead as a result of gunshot woundsa point not in dispute[his] intent to kill could be presumed." (Appellant's brief at p. 52.) Because the appellant did not present this argument to the trial court, we review it for plain error. See Rule 45A, Ala. R.App. P.
The statement about which the appellant complains occurred when the prosecutor was discussing the attempted murder charge regarding King. At that time, the prosecutor stated:
"Did he intend to kill her? That's a question before you. What is the evidence? He certainly fired that gun at point blank range at her. How far? Here? A little further back? Few feet? That in and of itself shows an intent to kill somebody. Pellets hit her? Yes. God saved her? Yes. Why did he want to do that? Take her out. What was his purpose? To rob. What did he say in his statement? Went there to rob? What did he say in his statement? `Then I shot the woman.' Intended to shoot? Yeah. What is an intent to murder? Point a gun at somebody. Intends to do it. Pull the trigger. What is going to happen? You're led to the natural and reasonable question of what you do. You point a 12 gauge shotgun and shoot it off at somebody, you're going to kill them unless they get awful lucky."
(R. 354-55) (emphasis added).
"In Sandstrom, the Supreme Court held that instructions which a reasonable jury could interpret as an `irrebuttable direction by the court to find intent' violate a defendant's due process rights. Sandstrom, 442 U.S. at 517, 99 S.Ct. 2450. The complained-of instruction in Sandstrom was asollows: `[T]he law presumes that a person intends the ordinary consequences of his voluntary acts.' The instruction in Sandstrom created a `mandatory presumption.'
"In DeRamus v. State, 565 So.2d 1167 (Ala.Cr.App.1990), the trial court gave a similar instruction to the jury as the one involved in the instant case. The instruction stated, `"[Intent] may be inferred from the character of the assault, the use of a deadly weapon or any other circumstances."' 565 So.2d at 1170. We stated that this instruction created a `permissive inference,' and was not error.
"`"A mandatory presumption instructs the jury that it must infer the presumed fact if the State proves certain predicate facts. A permissive reference suggests to the jury a possible conclusion to be drawn if the State proves predicate facts, but does not require the jury to draw that conclusion." Francis v. Franklin, 471 U.S. [307] at 314, 105 S.Ct. [1965] at 1971 [85 L.Ed.2d 344 (1985)]. A permissive inference only violates the Due Process Clause "if the suggested conclusion is not one that reason and common sense justify in light of the facts before [the] jury." 471 U.S. at 314, 105 S.Ct. at 1971.'

*829 "565 So.2d at 1170."
Hart v. State, 612 So.2d 520, 529 (Ala.Crim.App.1992), aff'd, 612 So.2d 536 (Ala.1992).
The statement did not create a mandatory presumption that shifted the burden of proof on the element of intent to the defense. Rather, the prosecutor argued that the appellant's actions created a "permissible inference" that could be drawn from the evidence. Further, the comment about which the appellant complains was clearly limited to the appellant's intent when he shot and wounded King. Therefore, the prosecutor's statement was not such that it would lead the jury to believe that it could conclude that the appellant intended to kill Ellis and Thompson simply because they died from gunshot wounds. Finally, during its oral charge, the trial court thoroughly instructed the jury on intent with regard to capital murder. When viewed in the context of the entire trial, we do not conclude that the prosecutor's comment "`so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" Darden, supra. Therefore, we do not find that there was any plain error in this regard.

I.
Ninth, the appellant contends that, during his guilt-phase closing argument, the prosecutor misstated or mischaracterized the facts that had been admitted into evidence. Because he did not object at trial to the first comment about which he now complains, we review that comment for plain error. See Rule 45A, Ala. R.App. P.
In the first instance about which the appellant complains, the prosecutor stated, "Remember Mrs. King said when he came back in, he had a different shirt on." (R. 377.) In his brief to this court, the appellant asserts that King actually testified that he was wearing a different shirt on the day of trial, not at the time of the murders. In the second instance about which the appellant complains the following occurred:
"[PROSECUTOR]: Now, you've got to answer two questions. One of them, the defense pretty well agrees with, this defendant Jeffrey Lee, intentionally and deliberately killed two people.
"[DEFENSE COUNSEL]: We don't agree with that.
"[PROSECUTOR]: This is argument.
"THE COURT: Overruled."
(R. 375.) Even if the prosecutor did misstate or mischaracterize the evidence presented at trial, his statements were not of such a nature that they "`so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" Darden, supra. The trial court repeatedly instructed the jury that the statements of the attorneys were not evidence and that it should consider only those statements that were supported by the evidence. We presume that the jury followed the trial court's instructions. See Taylor, supra. Therefore, we do not find that there was any error, plain or otherwise, in this regard.

J.
Tenth, the appellant contends that the prosecutor asked questions during the voir dire proceedings and presented arguments during his guilt-phase closing arguments that were "calculated to inflame the members of the jury" and to "tilt the scales towards a presumption of guilt." (Appellant's brief at pp. 56, 57.) At trial, he objected to only one of the questions about which he now complains. Therefore, we review the remaining questions and comments for plain error. See Rule 45A, Ala. R.App. P.
*830 After reviewing the questions and comments in the context of the entire proceedings, we conclude that they were not of such nature as to inflame the passions of the jury or to imply a presumption of guilt. Also, we view the statements of counsel in closing argument as having been made in the heat of debate, and we note that such statements are usually valued by the jury at their true worth and are not expected to become factors in the formation of the verdict. See Orr v. State, 462 So.2d 1013 (Ala.Crim.App.1984). Further, during its guilt-phase oral charge, the trial court instructed the jury as follows:
"Your verdict should not be based on sympathy, prejudice, or emotion, it should be on the law and the facts. To do otherwise would be to violate the oath you have taken."
(R. 403.) We presume that the jury followed the trial court's instructions. See Taylor, supra. Therefore, we do not find that there was any error, plain or otherwise, in this regard.

K.
Eleventh, the appellant contends that the prosecutor engaged in numerous instances prosecutorial misconduct during the penalty phase of his trial. However, the jury recommended a sentence of imprisonment for life without the possibility of parole. Therefore, error, if any, in the prosecutor's actions during the penalty phase was harmless. See Rule 45, Ala. R.App. P. See also Burgess v. State, 723 So.2d 742 (Ala.Crim.App.1997), aff'd, 723 So.2d 770 (Ala.1998).

L.
Finally, the appellant contends that "the cumulative effects of the prosecutor's misconduct requires reversal." (Appellant's brief at p. 60.) We have considered each of the allegations of prosecutorial misconduct individually, and we have not found that any of those allegations of error require reversal. We have also considered the allegations of prosecutorial misconduct cumulatively, and we do not find that "the accumulated errors have `probably injuriously affected [the appellant's] substantial rights.'" Ex parte Woods, 789 So.2d 941, 942-43 n. 1 (Ala.2001) (quoting Rule 45, Ala. R.App. P.). Therefore, the appellant's argument is without merit.

VI.
The appellant's sixth argument is that the trial court erroneously denied his motion to suppress the statement he made to law enforcement officers.

A.
Initially, the appellant contends that the statement was the product of an illegal arrest. Specifically, he asserts that he was arrested without a warrant and that the record does not indicate that the law enforcement officers had probable cause to arrest him. However, he did not present this argument to the trial court. Rather, he raises it for the first time on appeal. Therefore, we review it for plain error. See Rule 45A, Ala. R.App. P.
The record on appeal does not include evidence regarding the circumstances surrounding the appellant's arrest because he did not first present this argument to the trial court. "Because there is nothing in the record to indicate that the appellant was arrested without probable cause, the alleged error is not `plain.' See McNair v. State, 653 So.2d 320 (Ala.Cr.App.1992)." See Hunt v. State, 659 So.2d 933, 947 (Ala.Crim.App.1994), aff'd, 659 So.2d 960 (Ala.1995).

B.
The appellant also contends that he did not voluntarily make the statement.[7] *831 Specifically, he alleges that he was susceptible to police coercion, that the circumstances surrounding his statement were coercive, and that Freine offered him an improper promise of reward.
"It has long been held that a confession, or any inculpatory statement, is involuntary if it is either coerced through force or induced through an express or implied promise of leniency. Bram v. United States, 168 U.S. 532, 18 S.Ct. 183, 42 L.Ed. 568 (1897). In Culombe, 367 U.S. at 602, 81 S.Ct. at 1879, the Supreme Court of the United States explained that for a confession to be voluntary, the defendant must have the capacity to exercise his own free will in choosing to confess. If his capacity has been impaired, that is, `if his will has been overborne' by coercion or inducement, then the confession is involuntary and cannot be admitted into evidence. Id. (emphasis added).
"The Supreme Court has stated that when a court is determining whether a confession was given voluntarily it must consider the `totality of the circumstances.' Boulden v. Holman, 394 U.S. 478, 480, 89 S.Ct. 1138, 1139-40, 22 L.Ed.2d 433 (1969); Greenwald v. Wisconsin, 390 U.S. 519, 521, 88 S.Ct. 1152, 1154, 20 L.Ed.2d 77 (1968); see Beecher v. Alabama, 389 U.S. 35, 38, 88 S.Ct. 189, 191, 19 L.Ed.2d 35 (1967). Alabama courts have also held that a court must consider the totality of the circumstances to determine if the defendant's will was overborne by coercion or inducement. See Ex parte Matthews, 601 So.2d 52, 54 (Ala.) (stating that a court must analyze a confession by looking at the totality of the circumstances), cert. denied, 505 U.S. 1206, 112 S.Ct. 2996, 120 L.Ed.2d 872 (1992); Jackson v. State, 562 So.2d 1373, 1380 (Ala.Crim.App.1990) (stating that, to admit a confession, a court must determine that the defendant's will was not overborne by pressures and circumstances swirling around him); Eakes v. State, 387 So.2d 855, 859 (Ala.Crim.App.1978) (stating that the true test to be employed is `whether the defendant's will was overborne at the time he confessed') (emphasis added). Thus, to determine whether McLeod's confession was improperly induced, we must determine if his will was `overborne' by an implied promise of leniency.
"....
"... Thus, the test of involuntariness of a confession, or other inculpatory statement, is not whether the defendant bargained with the police, but whether in his discussions with the police, which may have included bargaining, the defendant's will was overborne by `apprehension of harm or hope of favor.' See Gaddy, 698 So.2d at 1154 (quoting Ex parte Weeks, 531 So.2d 643, 644 (Ala.1988)); Culombe, 367 U.S. at 602, 81 S.Ct. at 1879; Jackson, 562 So.2d at 1380. To determine if a defendant's will has been overborne, we must assess `the conduct of the law enforcement officials in creating pressure and the suspect's capacity to resist that pressure'; `[t]he defendant's personal characteristics as well as his prior experience with the criminal justice system are factors to be *832 considered in determining [the defendant's] susceptibility to police pressures.' Jackson, 562 So.2d at 1380-81 (citations omitted)."
McLeod v. State, 718 So.2d 727, 729-30 (Ala.1998) (footnote omitted). Further,
"[i]n Dobyne v. State, 672 So.2d 1319 (Ala.Cr.App.1994), aff'd, 672 So.2d 1354 (Ala.1995), cert. denied, 517 U.S. 1169, 116 S.Ct. 1571, 134 L.Ed.2d 670 (1996), we stated the following regarding the impact of a low IQ on the voluntariness of a confession:
"`Having a low IQ will not render a waiver ineffective unless the individual's IQ is so low that the person attempting to waive his rights absolutely cannot understand his Miranda rights. Arnold v. State, 448 So.2d 489 (Ala.Cr.App.1984).
"`"We have often held that `the fact that a defendant may suffer from a mental impairment or low intelligence will not, without other evidence, render a confession involuntary.' See Colorado v. Connelly, 479 U.S. 157, 107 S.Ct. 515, 520, 93 L.Ed.2d 473 (1986); Baker v. State, 599 So.2d 60, 63 (Ala.Cr.App.1991), State v. Austin[, 596 So.2d 598 (Ala.Crim.App.1991)], supra, Holladay v. State, 549 So.2d 122 (Ala.Cr.App.1988), aff'd, 549 So.2d 135 (Ala.1989), cert. denied, 493 U.S. 1012, 110 S.Ct. 575, 107 L.Ed.2d 569 (1989)."
"`Youngblood v. State, 656 So.2d 385, 387 (Ala.Cr.App.1993).
"`"[A] defendant's mental impairment, even if it exists, is merely one factor affecting the validity of his waiver of rights and the voluntariness of his confession. See generally Annot., 8 A.L.R.4th 16 (1981). `While an accused's intelligence and literacy are important factors to be considered in determining whether he intelligently and voluntarily waived his constitutional rights and made a confession, weak intellect or illiteracy alone will not render a confession inadmissible.' Hobbs v. State, 401 So.2d 276, 282 (Ala.Cr.App.1981)."
"`Whittle v. State, 518 So.2d 793, 796-97 (Ala.Cr.App.1987).'
"672 So.2d at 1337."
Jackson v. State, 791 So.2d 979, 1009-10 (Ala.Crim.App.2000). Finally,
"`[c]onflicting evidence given at [a] suppression hearing presents a credibility choice for the trial court.' Atwell v. State, 594 So.2d 202, 212 (Ala.Cr.App.1991), cert. denied, 594 So.2d 214 (Ala.1992). `[A] trial court's ruling based upon conflicting evidence given at a suppression hearing is binding on this Court, and is not to be reversed absent a clear abuse of discretion.' Jackson v. State, 589 So.2d 781, 784 (Ala.Cr.App.1991) (citations omitted)."
Rutledge v. State, 651 So.2d 1141, 1144-45 (Ala.Crim.App.1994).
During the suppression hearing, Lieutenant Investigator Roy Freine of the Dallas County Sheriff's Department testified that he initially made contact with the appellant during the early morning hours of December 13, 1998, at the Super 8 Motel in Newnan, Georgia; that four other members of his department and three law enforcement officers from Coweta County accompanied him; that they arrested the appellant for capital murder; that the appellant did not appear to be intoxicated or under the influence of drugs; that the appellant did not have any injuries; that the appellant was quiet and calm when he was taken into custody; and that a deputy transported the appellant from the Super 8 Motel to the Coweta County Jail. He also testified that, at the jail, he and the appellant were in a 10×10 interview room; that, *833 while the appellant made his statement, no one else was with them in the interview room; that he was with the appellant between thirty and forty minutes; that he did not offer the appellant any promise or hope of reward; that he did not threaten or coerce the appellant; that, while they were in the interview room, the appellant did not appear to be suffering from any injuries, illness, intoxication, or anything else that the appellant or anyone else had brought to his attention; that, while they were in the interview room, the appellant was mild, calm, and quiet; that the appellant did not appear to be slow; that, around 4:44 a.m., he read the appellant his Miranda rights from a card; that the appellant initialed the bottom of the card and indicated that he understood his rights; that he went over the waiver of rights form with the appellant; that the appellant printed his name on the waiver form; that the appellant started making his statement around 4:54 a.m.; that he told the appellant that he had him on videotape; that he did not tell the appellant that it would be better or worse for him to go ahead and confess; that the appellant was straightforward and told him about what had happened; that the appellant was kind of remorseful about what had happened; that it took the appellant between five and ten minutes to tell him what had happened; and that he wrote down what the appellant told him. Freine further testified that, after he had written out the appellant's statement, he read the statement to the appellant; that he placed the statement so that the appellant could read along with him; that Investigator Howard was in the interview room while he reviewed the statement with the appellant; that he made some minor changes to the statement; that he asked the appellant if he had anything to add to or take out of the statement; that the appellant said he did not; that the appellant initialed the beginning and end of each paragraph in the statement; and that he, the appellant, and Howard signed the statement.
During the suppression hearing, the appellant testified that Freine told him that he had a videotape of him going into the pawnshop and committing the offenses and that he would be better off if he made a statement. However, he also stated that he talked freely to Freine.
Based on Freine's testimony, the trial court could have reasonably concluded that the appellant voluntarily made his statement and that his will was not overborne. Although the appellant presented some evidence about his low intelligence level at trial, the State presented conflicting evidence that he was malingering. Further, he did not present any evidence to show that his intelligence level was so low that he absolutely could not understand his Miranda rights. Therefore, the trial court properly denied the appellant's motion to suppress the statement he made to law enforcement officers.

VII.
The appellant's seventh argument is that the trial court improperly characterized him during the voir dire proceedings.[8]

*834 A.
Initially, the appellant contends that the trial court's instructions to the panels of veniremembers regarding capital offenses "improperly characterized [him] as someone in the same category with individuals who would rob, rape, kidnap, or commit a double murder;" that "[t]his evidence was completely irrelevant to [his] trial as he was not charged with either rape or kidnaping;" and that this "characterization unraveled the presumption of innocence surrounding [him] and instead cloaked him in the presumption of guilt." (Appellant's brief at pp. 65-66.) Because he did not object to the instructions about which he now complains, we review them for plain error. See Rule 45A, Ala. R.App. P.
During the voir dire proceedings, before the trial court questioned each panel of veniremembers about their views on the death penalty, it gave the jurors a brief overview of Alabama's capital murder scheme. During its instructions to the first panel, the trial court stated:
"Before we get started with that, I'll give you a brief description of what the capital law in Alabama is.
"Not every homicide in Alabama makes a person eligible for the death penalty.
"Not every intentional killing makes a person eligible for the death penalty.
"There are 18 different offenses for which a person can be charged with capital murder. Murder during robbery is one, murder during the course of kidnapping is one, murder during the course of a rape is one, double murder is another one. There are several. There is a list of about 18.
"Now, in this case, the indictment charges murder during the course of robbery and murder of two or more persons pursuant to one course of conduct."
(S.R. 93-94.) The trial court gave substantially similar instructions to the remaining panels of veniremembers. (S.R. 122, 151-52.)
The trial court's instructions did not improperly characterize the appellant. Rather, the trial court simply explained Alabama's capital murder scheme to the veniremembers. That explanation was relevant to the subsequent questions regarding the veniremembers' beliefs about the death penalty and whether or not they could follow the law as it was explained to them in determining whether to impose the death penalty. Further, the trial court specifically informed the veniremembers that the only capital offenses involved in this case were murder during a robbery and "double murder." Finally, the instructions did not destroy the appellant's presumption of innocence. Therefore, we do not find that there was any plain error in this regard.

B.
The appellant also contends that the trial court's statements about the types of murder that are eligible for the death penalty were misleading and "impermissibly diminished the reliability of the sentencing determination as in [his] case and likely distracted the jurors from their task of weighing the aggravating and mitigating circumstances." (Appellant's brief at p. 66.) However, the jury recommended a sentence of imprisonment for life without the possibility of parole. Therefore, error, if any, in the trial court's statements was *835 harmless. See Rule 45, Ala. R.App. P. See also Burgess v. State, 723 So.2d 742 (Ala.Crim.App.1997), aff'd, 723 So.2d 770 (Ala.1998).

C.
Finally, the appellant contends that the trial court diminished the veniremembers' sense of responsibility when it informed them that they "would be done with [his] trial in only two to three days" and that "they were going to be able to go home like a non-capital jury." (Appellant's brief at pp. 66-67.) Because he did not object to the statements about which he now complains, we review them for plain error. See Rule 45A, Ala. R.App. P.
During its instructions to the veniremembers, the trial court stated:
"The law makes requirements for capital cases that are not required otherwise. One is that the jury may be sequestered. We have no plans to sequester you. Sequester means to keep you in a hotel during the trial. We don't plan to do that. The ones who will be here will be able to go home and come back just as you would on a normal jury."
(S.R. 33-34.) Subsequently, the trial court stated:
"I feel like we should be able to complete this case in two or three days. We'll probable be here at least until Wednesday possibly going into Thursday."
(S.R. 35.)
Contrary to the appellant's assertions, the trial court's statements that it would not sequester the jury and its belief about the duration of the trial did not diminish the veniremembers' sense of responsibility or lead them to believe that the trial should not be taken very seriously. Rather, the trial court simply gave the veniremembers details about their potential service in this case. Therefore, we do not find that there was any plain error in this regard.

VIII.
The appellant's eighth argument is that the trial court erroneously instructed the jury during the guilt phase of his trial.
"No party may assign as error the court's giving or failing to give [an] instruction, or the giving of an erroneous, misleading, incomplete, or otherwise improper oral charge, unless the party objects thereto before the jury retires to consider its verdict, stating the matter to which he or she objects and the grounds of the objection."
Rule 21.3, Ala. R.Crim. P.

A.
First, the appellant contends that the trial court did not give appropriate instructions on lesser included offenses.

i.
Initially, the appellant asserts that the trial court erroneously instructed the jury on the lesser included offense of intentional murder with regard to Counts I and II of the indictment.[9] Specifically, he contends that the trial court instructed the jury "that intentional murder did not require intent." (Appellant's brief at p. 68.) The appellant did not object to the trial court's instruction on intentional murder. Rather, he stated that he was satisfied with the trial court's instructions. See Rule 21.3, Ala. R.Crim. P.; Bullock v. State, 697 So.2d 66 (Ala.Crim.App.1997). *836 Therefore, we review this argument for plain error. See Rule 45A, Ala. R.App. P.
With regard to Count I of the indictment, the trial court initially instructed the jury as follows:
"The next lesser included offense that I'll tell you about is the offense of intentional murder. The definition is the same as I previously gave you, but I'll give it to you again.
"A person commits the crime of murder if he causes the death of another person, and in performing the act or acts which caused the death of that person, he intends to kill that person.
"To convict, the State must prove beyond a reasonable doubt each of the following elements of murder.
"That Jimmy Ellis is dead,
"That the defendant, Jeffrey Lee, caused the death of Jimmy Ellis by shooting him,
"And that in committing the act or acts which caused the death of Jimmy Ellis the defendant lacked intent.
"The definition of intent is the same as I previously have given you.
"If you find from the evidence that the State has proved beyond a reasonable doubt each of the above elements of the offense of murder as charged, you shall find the defendant guilty of murder."
(R. 390-91.) With regard to Count II of the indictment, the trial court instructed the jury as follows:
"The lesser included offense under Count 2 would be the offense of intentional murder. Intentional murder again has the same definition that I previously have given you, and that is, that a person commits the crime of murder if he causes the death of another person in performing the act or acts which caused the death of that person he intended to kill that person.
"To convict, the State must prove beyond a reasonable doubt the following elements of murder.
"That Elaine Thompson is dead,
"That the defendant caused the death of Elaine Thompson by shooting her and,
"That in the committing the acts or acts which caused the death of Elaine Thompson, the defendant lacked intent.
"Again, a person acts intentionally when it's his purpose to cause the death of another
"If you find from the evidence that the State has proved beyond a reasonable doubt each of the above elements of the offense of murder as charged, then you shall find the defendant guilty of murder."
(R. 395.) Further, when the trial court instructed the jury on each count of robbery-murder, it thoroughly instructed on intentional murder and on intent.
After reviewing the trial court's instructions in their entirety, we find that the trial court adequately instructed the jury on intentional murder and instructed the jury that the State had to prove that the appellant intended to kill Ellis and Thompson. Therefore, we do not find that there was any plain error in this regard.
The appellant further contends that the trial court effectively "directed a verdict as to Count III of the indictment  intentional murder of two or more." (Appellant's brief at p. 70.) Because he did not present this argument to the trial court, we review it for plain error. See Rule 45A, Ala. R.App. P.
The basis for the appellant's argument is not clear. However, we have reviewed the trial court's instructions in their entirety, and we find that the trial court did not effectively direct a verdict as to Count III *837 of the indictment. Therefore, we do not find that there was any plain error in this regard.

ii.
The appellant further asserts that the trial court erred when it refused to instruct the jury "on any non-intentional lesser included offenses as to Count II  the intentional murder during a robbery of Elaine Thompson, despite defense counsel's request." (Appellant's brief at p. 69.)[10] However, he did not object when the trial court refused to give his requested instructions on non-intentional lesser included offenses with regard to Count II. See Rule 21.3, Ala. R.Crim. P.; Bullock, supra. Therefore, we review this argument for plain error. See Rule 45A, Ala. R.App. P.
"The court shall not charge the jury with respect to an included offense unless there is a rational basis for a verdict convicting the defendant of the included offense."
§ 13A-1-9(b), Ala.Code 1975.
King testified that, when the appellant entered the pawnshop, he said, "`What's up, mother f'"; that he pulled the shotgun; that he shot Ellis; that she heard another shot; that Thompson fell; that Thompson's face was bleeding all over; and that the appellant was standing a few feet away from Ellis and Thompson when he shot them. (R. 209.) Further, in his statement to Freine, the appellant said that he entered the pawnshop with a sawed-off shotgun; that he told the man and the two women in the pawnshop that it was a robbery and asked for money; that the shotgun was pointed at the man; that the shotgun accidentally went off the first time; and that he then shot the two women. The evidence did not support instructions on non-intentional lesser included offenses with regard to the killing of Elaine Thompson. Therefore, we do not find that there was any plain error in this regard.

iii.
Finally, the appellant asserts that the trial court erroneously refused to instruct the jury on the lesser included offense of robbery with regard to Counts I and II of the indictment. However, he did not request an instruction on robbery with regard to either of those counts, and he did not object when the trial court did not instruct the jury on robbery. See Rule 21.3, Ala. R.Crim. P.; Bullock, supra. Therefore, we review this argument for plain error. Rule 45A, Ala. R.App. P.
King testified that the appellant shot Ellis and Thompson. Further, in his statement to law enforcement officers, the appellant admitted that he shot both Ellis and Thompson. Finally, the State presented evidence that Ellis and Thompson died from gunshot wounds. Therefore, the evidence did not support an instruction on robbery as a lesser included offense of Counts I and II. Accordingly, we do not find that there was any plain error in this regard.

B.
Second, the appellant contends that the trial erred by not instructing the jury on intoxication. Specifically, he asserts that, "[d]uring the guilt phase of [his] trial, there was evidence introduced that [he] had a substance abuse problem, and that he was likely intoxicated on the day of the *838 crime." (Appellant's brief at p. 71.) However, he did not request an instruction on intoxication, and he did not object when the trial court did not instruct the jury on intoxication. See Rule 21.3, Ala. R.Crim. P.; Bullock, supra. Therefore, we review this argument for plain error. See Rule 45A, Ala. R.App. P.
The Legislature has defined "intoxication" to include "a disturbance of mental or physical capacities resulting from the introduction of any substance into the body." § 13A-3-2(e)(1), Ala.Code 1975. Thus, evidence of ingestion of alcohol or drugs, standing alone, is not sufficient to support a charge on intoxication. In addition, there must be evidence that the ingestion caused a disturbance of the person's mental or physical capacities and that that mental or physical disturbance existed at the time the offense was committed. This interpretation is borne out by our decision in Windsor v. State, 683 So.2d 1027, 1037 (Ala.Crim.App.1994), aff'd, 683 So.2d 1042 (Ala.1996), in which we held:
"In this case, however, there was no evidence that the appellant was intoxicated. Although there was evidence that the appellant had been drinking beer on the day of the robbery-murder, there was no evidence concerning the quantity of beer he consumed that day at the time of the murder. Evidence that someone was drinking an alcoholic beverage is not evidence that that person was intoxicated. There was no `reasonable theory' to support an instruction on intoxication because there was no evidence of intoxication. The court did not err in not instructing the jury on intoxication and manslaughter where there was no evidence that the appellant was intoxicated at the time the robbery-murder occurred."
(Emphasis added.) As we held in Hunt v. State, 659 So.2d 933, 957-58 (Ala.Crim.App.1994), aff'd, 659 So.2d 960 (Ala.1995):
"The appellant contends that the trial court erred in failing to instruct the jury on voluntary intoxication.
"In his oral instructions to the jury, the trial judge instructed the jury on intentional murder and felony murder as lesser included offenses of the capital crimes charged in the indictment. Defense counsel raised no objection to those particular portions of the oral charge and, on one occasion, announced `satisfied.' R. 881, 882, 888. The trial judge repeatedly instructed the jury on the definition of intent and the requirement that the killing have been intentionally committed. Although there was evidence that the appellant had consumed alcohol and drugs shortly before the murder, the trial judge was not requested to and did not instruct the jury on the legal principles of intoxication in connection with criminal liability. No objection was made at trial to the court's failure to give such an instruction.
"In Fletcher v. State, 621 So.2d 1010 (Ala.Cr.App.1993), the trial court did not instruct the jury on the legal principles of intoxication and this Court found that that omission constituted plain error. In Fletcher however, the trial judge, sua sponte, stated at the close of the State's case that he would not give a charge on intoxication because he `"did not get the impression from the evidence that [the defendant] was so intoxicated that he didn't know what he was doing."' 621 So.2d at 1018. We held that this determination by the trial court `"invaded the exclusive province of the jury,"' id. at 1021, and, under the particular facts involved, amounted to plain error.
"In contrast, in the instant case, the matter of an intoxication charge was *839 not raised by anyone at the guilt phase of the trial. In fact, defense counsel objected to the references during the trial to the appellant's drug use and, in addition to the appellant's defense that he did not commit the murder, defense counsel suggested during closing argument that, at most, the evidence supported a conviction of intentional murder only. Thus, it appears that the appellant's defense strategy was to convince the jury either that he did not commit the murder or that the killing was intentionally done, but without sexual overtones. There was no claim that he was unable to form the intent to kill because he was intoxicated. Where, as in this case, an intoxication instruction would conflict with defense strategy, there is no plain error in the trial court's failure to give such an instruction. Gurley v. State, 639 So.2d 557, 560-61 (Ala.Cr.App.1993)."
Finally, under § 13A-1-9(b), Ala.Code 1975, a trial court is not required to instruct on a lesser included offense "unless there is a rational basis for a verdict convicting the defendant of the included offense."
The testimony at trial did not establish that the appellant was intoxicated at the time of the murders. Neither the State nor the appellant presented any evidence that the appellant had actually ingested alcohol or drugs on the day of the offenses. Therefore, the appellant was not entitled to an instruction on intoxication. Accordingly, we do not find that there was any plain error in this regard.

C.
Third, the appellant contends that the trial court "encouraged the jury to convict [him] of capital murder" by instructing it to consider the charge of capital murder before it considered the lesser included offenses and before it considered acquitting him. (Appellant's brief at p. 71.) Because he did not present this argument to the trial court, we review it for plain error. See Rule 45A, Ala. R.App. P.
"`When a greater and a lesser included offense are charged, the proper course is for the trial judge to instruct the jury to consider first the greater offense and then consider the lesser offense only if a reasonable doubt exists concerning the accused's guilt of the greater offense.' Bragg v. State, 453 So.2d 756, 759 (A1a.Cr.App.1984) (emphasis in original). See also Lindsey v. State, 456 So.2d 383, 387 (Ala.Cr.App.1983) (`The trial court's instruction to this effect, that the jury should not consider the lesser included offenses unless it found the appellant "not guilty" of the capital offense was in accordance with and justified by [§ 13A-5-41]'), affirmed, 456 So.2d 393 (Ala.1984), cert. denied, 470 U.S. 1023, 105 S.Ct. 1384, 84 L.Ed.2d 403 (1985)."
Parker v. State, 587 So.2d 1072, 1084 (Ala.Crim.App.1991), aff'd, 610 So.2d 1181 (Ala.1992). The trial court properly instructed the jury to consider the capital murder charges before it considered the lesser included offenses and before it considered acquitting the appellant. Accordingly, we do not find that there was any plain error in this regard.

D.
Fourth, the appellant contends that the trial court improperly instructed the jury on the element of intent. Specifically, he alleges that the trial court's instruction on intent improperly shifted the burden of proof to him and that he had to prove that he did not have the intent to commit capital murder. Because he did not object to the trial court's instructions regarding intent, *840 we review this argument for plain error. See Rule 45A, Ala. R.App. P.
The trial court instructed the jury on intent with regard to Count I as follows:
"Intent for the purpose of committing the capital offense of murder during robbery in Count 1 means it was the Defendant's purpose to cause the death of Jimmy Ellis.
"Intent to kill must be real and specific. Intent simply means a design or resolve or determination which a person acts. It's a state of mind and in most instances it cannot be proven by direct proof, but the jury may infer intent from the circumstances surrounding the commission of an act."
(R. 387.) With regard to Count 2, the trial court instructed the jury on intent as follows:
"Intent, for the purpose of committing the capital offense of murder during robbery, means that the defendant's purpose was to cause the death of Elaine Thompson.
"Intent to kill must be real and specific.
"Intent means a design or resolve and determination which a person acts. It's a state of mind that in most instances cannot be proved by direct proof. But again, the jury may infer intent from the circumstances surrounding the commission of an act."
(R. 394.)
"In Sandstrom, the Supreme Court held that instructions which a reasonable jury could interpret as an `irrebuttable direction by the court to find intent' violate a defendant's due process rights. Sandstrom, 442 U.S. at 517, 99 S.Ct. at 2455-56. The complained-of instruction in Sandstrom was as follows: `[T]he law presumes that a person intends the ordinary consequences of his voluntary acts.' The instruction in Sandstrom created a `mandatory presumption.'
"In DeRamus v. State, 565 So.2d 1167 (Ala.Cr.App.1990), the trial court gave a similar instruction to the jury as the one involved in the instant case. The instruction stated,' "[Intent] may be inferred from the character of the assault, the use of a deadly weapon or any other circumstances."' 565 So.2d at 1170. We stated that this instruction created a `permissive inference,' and was not error.
"`"A mandatory presumption instructs the jury that it must infer the presumed fact if the State proves certain predicate facts. A permissive reference suggests to the jury a possible conclusion to be drawn if the State proves predicate facts, but does not require the jury to draw that conclusion." Francis v. Franklin, 471 U.S. [307] at 314, 105 S.Ct. [1965] at 1971 [85 L.Ed.2d 344 (1985)]. A permissive inference only violates the Due Process Clause "if the suggested conclusion is not one that reason and common sense justify in light of the facts before [the] jury." 471 U.S. at 314, 105 S.Ct. at 1971.'
"565 So.2d at 1170."
Hart v. State, 612 So.2d 520, 529 (Ala.Crim.App.), aff'd, 612 So.2d 536 (Ala.1992).
The trial court's instructions on intent, when viewed in the context of the trial court's entire oral charge, did not create a mandatory presumption that shifted the burden of proof to the appellant. Rather, they created a "permissible inference" that could be drawn from the evidence. Therefore, we do not find that there was any plain error in this regard.

E.
Fifth, the appellant contends that the trial court erred when it did not instruct *841 the jury that it could consider the voluntariness of his statement when determining the weight it would give the statement. However, he did not request such an instruction, and he did not object when the trial court did not give such an instruction. Therefore, we review this argument for plain error. See Rule 45A, Ala. R.App. P.
The trial court did not instruct the jury that it had previously determined that the appellant's statement to law enforcement officers was voluntary and admissible. Further, the trial court instructed the jury that it would determine the weight to be given to the evidence and the credibility of the witnesses. Therefore, we do not find that there was any error in the trial court's instructions in this regard.

IX.
The appellant's ninth argument is that the trial court's instruction on reasonable doubt violated the principles of Cage v. Louisiana, 498 U.S. 39, 111 S.Ct. 328, 112 L.Ed.2d 339 (1990). However, he did not present this argument to the trial court. Therefore, we review it for plain error. See Rule 45A, Ala. R.App. P.
During its guilt-phase instructions, the trial court stated:
"The phrase, `reasonable doubt' is self-explanatory. Efforts to define it don't always clarify the term, but it may help you some to say that a doubt which would justify an acquittal must be an actual doubt, and not a mere guess or surmise or whim, and it's not a forced doubt.
"A reasonable doubt which entitles an accused to an acquittal is not a mere fanciful, vague, conjectural or speculative doubt, it's a doubt which rises from all or any part of the evidence or from a lack of evidence and remaining after a careful consideration of the testimony.
"Now you'll observe that the State is not required to convince you of the defendant's guilt beyond all doubt, but simply beyond a reasonable doubt."
(R. 384.) During its penalty-phase instructions, the trial court stated:
"A reasonable doubt is a doubt for which you can assign a reason. It does not mean a doubt which arises from some mere whim or surmise or guess."
(R. 441.)
In Knotts v. State, 686 So.2d 431 (Ala.Crim.App.), opinion after remand, 686 So.2d 484 (Ala.Crim.App.1995), aff'd, 686 So.2d 486 (Ala.1996), we held:
"The Due Process Clause of the Fourteenth Amendment `protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged.' In re Winship, 397 U.S. 358, 364, 90 S.Ct. 1068, 1073, 25 L.Ed.2d 368 (1970). In Cage v. Louisiana, the United States Supreme Court found that a jury charge that defined `reasonable doubt' by using the phrases `grave uncertainty,' `actual substantial doubt,' and `moral certainty' could have led a reasonable juror to interpret the instructions to allow a finding of guilt based on a degree of proof below that required by the Due Process Clause. Subsequently, the Court `made it clear that the proper inquiry is not whether the instruction "could have" been applied in an unconstitutional manner, but whether there is a reasonable likelihood that the jury did so apply it.' Victor v. Nebraska, 511 U.S. 1, 6, 114 S.Ct. 1239, 1243, 127 L.Ed.2d 583 (1994) (quoting Estelle v. McGuire, 502 U.S. 62, 72-73, and n. 4, 112 S.Ct. 475, 482 and n. 4, 116 L.Ed.2d 385 (1991), emphasis in original). Thus, the constitutional question presented here is whether there is a *842 reasonable likelihood that the jury understood the instructions to allow the conviction based on proof insufficient to meet the Winship reasonable doubt standard. Victor v. Nebraska; Ex parte Kirby, 643 So.2d 587 (Ala.), cert. denied, [513] U.S. [1023], 115 S.Ct. 591, 130 L.Ed.2d 504 (1994); Cox v. State, 660 So.2d 233 (Ala.Cr.App.1994).
"In reviewing the reasonable doubt instruction, we do so in the context of the charge as a whole. Victor v. Nebraska; Baker v. United States, 412 F.2d 1069 (5th Cir.1969), cert. denied, 396 U.S. 1018, 90 S.Ct. 583, 24 L.Ed.2d 509 (1970); Williams v. State, 538 So.2d 1250 (Ala.Cr.App.1988). So long as the definition of `reasonable doubt' in the charge correctly conveys the concept of reasonable doubt, the charge will not be considered so prejudicial as to mandate reversal. Victor v. Nebraska; Holland v. United States, 348 U.S. 121, 75 S.Ct. 127, 99 L.Ed. 150 (1954)."
686 So.2d at 459. "`Use of some but not all of the terminology found offensive in Cage does not automatically constitute reversible error.'" Taylor v. State, 666 So.2d 36, 56 (Ala.Crim.App.1994), aff'd, 666 So.2d 73 (Ala.1995) (quoting Dobyne v. State, 672 So.2d 1319, 1343 (Ala.Crim.App.1994), aff'd, 672 So.2d 1354 (Ala.1995)). Further, we have previously held that the statement that a reasonable doubt is a doubt for which a reason can be given does not violate Cage and does not improperly lessen the State's burden of proof. See Burgess v. State, 827 So.2d 134 (Ala.Crim.App.1998), aff'd, 827 So.2d 193 (Ala.2000); Ex parte McWilliams, 640 So.2d 1015 (Ala.1993), aff'd, 666 So.2d 90 (Ala.1995); McMillian v. State, 594 So.2d 1253 (Ala.Crim.App.1991). Finally, in Smith v. State, 756 So.2d 892, 922 (Ala.Crim.App.1997), aff'd, 756 So.2d 957 (Ala.2000), we held:
"Although the trial court did refer to a reasonable doubt as an `actual doubt,' it did not state that the doubt must be `grave' or `substantial,' as the faulty charge in Cage instructed. See Cage, 498 U.S. at 40, 111 S.Ct. at 328 (holding that the terms `grave' and `substantial' suggest a higher degree of doubt than that actually required to acquit). Furthermore, the trial court's instruction that the doubt could not be `fanciful,' `vague,' `speculative,' `arbitrary,' or `merely possible' follows the language of the Alabama Pattern Jury Instruction: Criminal on a reasonable doubt charge. The fact that the trial court followed an accepted pattern jury instruction weighs heavily against any finding of error. Carroll v. State, 599 So.2d 1253 (Ala.Cr.App.1992), aff'd, 627 So.2d 874 (Ala.1993), cert. denied, 510 U.S. 1171, 114 S.Ct. 1207, 127 L.Ed.2d 554 (1994); Dill v. State, 600 So.2d 343 (Ala.Cr.App.1991), aff'd, 600 So.2d 372 (Ala.1992), cert. denied, 507 U.S. 924, 113 S.Ct. 1293, 122 L.Ed.2d 684 (1993); Kuenzel v. State, 577 So.2d 474 (Ala.Cr.App.1990), aff'd, 577 So.2d 531 (Ala.), cert. denied, 502 U.S. 886, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991)."
Taken as a whole, the trial court's instructions in this case properly conveyed the concept of reasonable doubt to the jury and did not lessen the State's burden of proof. There is not a reasonable likelihood that the jury applied the instructions in a manner that would violate the appellant's constitutional rights. Therefore, we do not find that there was any plain error in this regard.

X.
The appellant's tenth argument is that the presence of King, Ellis' son, and Thompson's daughter rendered his trial "unfair, arbitrary, and capricious." (Appellant's *843 brief at p. 76.) Specifically, he challenges the fact that the prosecutor introduced King, Ellis' son, and Thompson's daughter to the panels of veniremembers during the voir dire proceedings and allowed them to sit at the State's table during the trial. However, he did not present this argument to the trial court. Therefore, we review it for plain error. See Rule 45A, Ala. R.App. P.
Generally, a trial court may exclude witnesses from the courtroom. See Rule 9.3(a), Ala. R.Crim. P. However, with regard to the right of victims to be present in the courtroom, the Code provides as follows:
"(a) The Legislature hereby finds and determines that it is essential to the fair and impartial administration of justice that a victim of a criminal offense be afforded a reasonable opportunity to attend any trial or hearing or any portion thereof conducted by any court which in any way pertains to such offense.
"(b) Further, the Legislature hereby finds and determines that it is essential to the fair and impartial administration of justice that a victim of a criminal offense not be excluded from any hearing or trial or any portion thereof conducted by any court which in any way pertains to such offense, merely because the victim has been or may be subpoenaed to testify at such hearing or trial or because of any arbitrary or invidious reason."
§ 15-14-51, Ala.Code 1975.
"The victim of a criminal offense shall be entitled to be present in any court exercising any jurisdiction over such offense and therein to be seated at the counsel table of any prosecutor prosecuting such offense...."
§ 15-14-53, Ala.Code 1975.
"A victim of a criminal offense shall not be excluded from court or counsel table during the trial or hearing or any portion thereof conducted by any court which in any way pertains to such offense...."
§ 15-14-54, Ala.Code 1975.
"A victim of a criminal offense shall be exempt from the operation of rule of court, regulation, or statute or other law requiring the separation or exclusion of witnesses from court in criminal trials or hearings."
§ 15-14-55, Ala.Code 1975. Also, with regard to the right of family members of victims to be present in the courtroom, § 15-14-56(a), Ala.Code 1975, provides:
"Whenever a victim is unable to attend such trial or hearing or any portion thereof by reason of death ... the victim's family may select a representative who shall be entitled to exercise any right granted to the victim, pursuant to the provisions of this article."
Finally, Rule 615, Ala. R. Evid., provides:
"At the request of a party the court may order witnesses excluded so that they cannot hear the testimony of other witnesses and it may make the order of its own motion. This rule does not authorize exclusion of ... a victim of a criminal offense or the representative of a victim who is unable to attend...."
Based on these statutes and rules, the trial court did not err in allowing King, Ellis' son, and Thompson's daughter to sit at the State's table during the trial proceedings. Therefore, we do not find that there was any plain error in this regard.

XI.
The appellant's eleventh argument is that the trial court improperly granted the State's challenges for cause based on veniremembers' opposition to the death penalty. Specifically, he challenges the removal of veniremembers C.T., J.H., *844 W.R., F.L., D.H., P.C., A.P. (# 168), R.T., D.J., and A.P. (# 170). At trial, he objected only to the removal of veniremembers C.T., J.H., W.R., and F.L. Therefore, we review the removal of the remaining veniremembers for plain error. See Rule 45A, Ala. R.App. P.
"On the trial for any offense which may be punished capitally or by imprisonment in the penitentiary, it is a good cause of challenge by the state that the person would refuse to impose the death penalty regardless of the evidence produced or has a fixed opinion against penitentiary punishment or thinks that a conviction should not be had on circumstantial evidence, which cause of challenge may be proved by the oath of the person or by other evidence."
§ 12-16-152, Ala.Code 1975.
"The trial judge is given much discretion in determining whether a potential juror should be struck for cause. According to Rule 18.4(e), Ala. R.Crim. P.:
"`When a prospective juror is subject to challenge for cause or it reasonably appears that the prospective juror cannot or will not render a fair and impartial verdict, the court, on its own initiative or on motion of any party, shall excuse that juror from service in the case.'
"....
"Furthermore, in order to determine whether the trial judge's exercise of discretion was proper, this Court will look to the questions directed to and answers given by the prospective juror on voir dire. Ex parte Cochran, 500 So.2d 1179 (Ala.1985)."
Holliday v. State, 751 So.2d 533, 535 (Ala.Crim.App.1999). Also," `[t]he trial judge is in the best position to hear a prospective juror and to observe his or her demeanor.'" McNair v. State, 653 So.2d 320, 324 (Ala.Crim.App.1992), aff'd, 653 So.2d 353 (Ala.1994) (quoting Ex parte Dinkins, 567 So.2d 1313, 1314 (Ala.1990)). Finally,
"[t]he test for determining whether a strike rises to the level of a challenge for cause is `whether a juror can set aside their opinions and try the case fairly and impartially, according to the law and the evidence.' Marshall v. State, 598 So.2d 14, 16 (Ala.Cr.App.1991). `Broad discretion is vested with the trial court in determining whether or not to sustain challenges for cause.' Ex parte Nettles, 435 So.2d 151, 153 (Ala.1983). `The decision of the trial court "on such questions is entitled to great weight and will not be interfered with unless clearly erroneous, equivalent to an abuse of discretion."' Nettles, 435 So.2d at 153."
Dunning v. State, 659 So.2d 995, 997 (Ala.Crim.App.1994)
During the voir dire proceedings, veniremembers D.H., C.T., J.H., P.C., A.P. (# 168), and R.T. all specifically indicated that they would not vote to impose the death penalty. Veniremembers D.J., W.R., F.L., and A.P. (# 170) indicated their opposition to the death penalty and gave conflicting responses to various questions from the attorneys about the death penalty. Based on those responses, the trial court could have reasonably concluded that the challenged veniremembers were ineligible to serve pursuant to § 12-16-152, Ala.Code 1975. Therefore, we do not find any error, plain or otherwise, in the trial court's granting of the State's challenges for cause of these veniremembers based on their feelings about the death penalty.

XII.
The appellant's twelfth argument is that the trial court improperly refused to remove veniremember G.F. for cause. Specifically, he contends that *845 veniremember G.F.'s "preference for the death penalty impaired her ability to be a fair minded juror." (Appellant's brief at p. 80.)
"In determining whether a veniremember should be excused for cause, the trial court should consider
"`"whether the juror can set aside her opinions and try the case fairly and impartially, according to the law and the evidence. Tidmore v. City of Birmingham, 356 So.2d 231 (Ala.Cr.App.1977), cert. denied, 356 So.2d 234 (Ala.), cert. denied, 439 U.S. 836, 99 S.Ct. 120, 58 L.Ed.2d 132 (1978); see Willingham v. State, 262 Ala. 550, 552, 80 So.2d 280 (1955); Mahan v. State, 508 So.2d 1180 (Ala.Cr.App.1986). This determination, again is to be based on the juror's answers and demeanor and is within the sound discretion of the trial judge."'
"Ex parte Windsor, 683 So.2d 1042, 1047 (Ala.1996), cert. denied, 520 U.S. 1171, 117 S.Ct. 1438, 137 L.Ed.2d 545 (1997) (quoting Knop v. McCain, 561 So.2d 229, 232 (Ala.1989)) (emphasis added).
"`[A] veniremember's personal feelings as to the law are immaterial unless those feelings are so unyielding as to preclude the veniremember from following the law as given in the court's instructions. "A veniremember who believes that the death penalty should automatically be imposed in every capital case should be excused." Martin v. State, 548 So.2d 488, 491 (Ala.Cr.App.1988), aff'd, 548 So.2d 496 (Ala.), cert. denied, 493 U.S. 970, 110 S.Ct. 419, 107 L.Ed.2d 383 (1989). However, veniremembers who favor the death penalty should not be excused for cause where they indicate they can follow the court's instructions. Id.'
"Smith v. State, 698 So.2d 189, 198 (Ala.Cr.App.1996), aff'd, 698 So.2d 219 (Ala.), cert. denied, 522 U.S. 957, 118 S.Ct. 385, 139 L.Ed.2d 300 (1997) (emphasis added)."
Maples v. State, 758 So.2d 1, 26-27 (Ala.Crim.App.1999), aff'd, 758 So.2d 81 (Ala.1999).
During voir dire examination by the State, the following occurred:
"[PROSECUTOR:] How many of you feel that the death penalty is a proper punishment? That you would impose it under the circumstances that the law provides for? If a man intentionally kills people in the course of a robbery, two or more, how many of you feel that way, that you would vote for it if the facts were there? ... [G.F.] ... Of those who feel that this is a proper punishment from the facts provided by law, and feel you would impose it under the proper facts, are there any of you that feel that where the facts would show to you an intentional killing, which it must in the course of a robbery of two or more people, that you would only impose the death penalty? That you would not consider the other alternative, life without parole? The thinking is, intentional killing. Therefore the punishment would be death. You feel so strongly that you could not consider the other alternative. And you're for the death penalty, you will impose it. Do you feel so strong about that that you cannot and will not impose or consider life without parole?
"... (No response.)
"[PROSECUTOR:] Do you understand my question? Those of you then who feel the death penalty is proper, any of you feel that can only impose the death penalty?
"... (No response.)"
*846 (R. 100-01.) Subsequently, during voir dire examination by the defense, the following occurred:
"[DEFENSE COUNSEL:] [Veniremember G.F.], I'm going to ask you the same question. I want an honest answer because there's no right or wrong answer. First, there's a situation where  First, if the evidence has shown to you that a person killed one or more people, and in your mind it was a situation where there was no justification such as self-defense or some other type justification, would the punishment be automatically death?
"[VENIREMEMBER G.F.:] No.
"[DEFENSE COUNSEL:] No. You would be able to come back with life without parole or murder or some other?
"[VENIREMEMBER G.F.:] Yes."
(R. 113.) Although veniremember G.F. indicated that she believed that the death penalty was an appropriate punishment in certain circumstances, she did not indicate that she would automatically vote to impose the death penalty in every capital case. Rather, she indicated that she would consider and would be able to vote to impose a sentence of imprisonment for life without the possibility of parole in an appropriate case. Veniremember G.F.'s responses during the voir dire proceedings refute the appellant's contention that she was biased in favor of the death penalty. Accordingly, the trial court did not abuse its discretion in refusing to remove veniremember G.F. for cause.[11]

XIII.
The appellant's thirteenth argument is that the trial court improperly admitted several exhibits for which the State allegedly did not establish a chain of custody. Specifically, he contends that the State did not establish a chain of custody for the shotgun, the shotgun shells, the videotape from the pawnshop, the Miranda rights card, his statement, various photographs, the victims' bodies, and samples from the victims' bodies that the toxicologist tested. Because he did not present this argument to the trial court, we review it for plain error. See Rule 45A, Ala. R.App. P.
In reviewing this argument, we are guided by the following principles:
"In Ex parte Holton, this Court examined the evidentiary foundation required to authenticate and identify demonstrative evidence:
"`The chain of custody is composed of "links." A "link" is anyone who handled the item. The State must identify each link from the time the item was seized. In order to show a proper chain of custody, the record must show each link and also the following with regard to each link's possession of the item: "(1) [the] receipt of the item; (2)[the] ultimate disposition of the item, i.e., transfer, destruction, or retention; and (3)[the] *847 safeguarding and handling of the item between receipt and disposition." Imwinklereid, The Identification of Original, Real Evidence, 61 Mil. L.Rev. 145, 159 (1973).
"`If the State, or any other proponent of demonstrative evidence, fails to identify a link or fails to show for the record any one of the three criteria as to each link, the result is a "missing" link, and the item is inadmissible. If, however, the State has shown each link and has shown all three criteria as to each link, but has done so with circumstantial evidence, as opposed to the direct testimony of the "link," as to one or more criteria or as to one or more links, the result is a "weak" link. When the link is "weak," a question of credibility and weight is presented, not one of admissibility.'
"[Ex parte Holton,] 590 So.2d [918], 920 [(Ala.(1991))]; see also Ex parte Cook, 624 So.2d 511, 513 (Ala.1993)."

Kennedy v. State, 690 So.2d 1222, 1223-24 (Ala.1996). "`The purpose for requiring that the chain of custody be shown is to establish to a reasonable probability that there has been no tampering with the evidence.'" Jones v. State, 616 So.2d 949, 951 (Ala.Crim.App.1993) (quoting Williams v. State, 505 So.2d 1252, 1253 (Ala.Crim.App.1986), aff'd, 505 So.2d 1254 (Ala.1987)).
"`"`Tangible evidence of crime is admissible when shown to be "in substantially the same condition as when the crime was committed." And it is to be presumed that the integrity of evidence routinely handled by governmental officials was suitably preserved "[unless the accused makes] a minimal showing of ill will, bad faith, evil motivation, or some evidence of tampering." If, however, that condition is met, the Government must establish that acceptable precautions were taken to maintain the evidence in its original state.
"`"`The undertaking on that score need not rule out every conceivable chance that somehow the [identity] or character of the evidence underwent change. "[T]he possibility of misidentification and adulteration must be eliminated," we have said, "not absolutely, but as a matter of reasonable probability." So long as the court is persuaded that as a matter of normal likelihood the evidence has been adequately safeguarded, the jury should be permitted to consider and assess it in the light of surrounding circumstances.'"'
"Moorman v. State, 574 So.2d 953, 956-7 (Ala.Cr.App.1990)."
Blankenship v. State, 589 So.2d 1321, 1324-25 (Ala.Crim.App.1991). Also, "evidence that an item has been sealed is adequate circumstantial evidence to establish the handling and safeguarding of the item." Lane v. State, 644 So.2d 1318, 1321 (Ala.Crim.App.1994). Further, "`[a]ny conflict in the evidence concerning the chain of custody is addressed to the weight of the proffered physical exhibit as opposed to its admissibility.'" W.L.L. v. State, 649 So.2d 1335, 1340 (Ala.Crim.App.1994) (quoting Joseph A. Colquitt, Alabama Law of Evidence § 9.1(c) (1990)). Finally,
"[p]hysical evidence connected with or collected in the investigation of a crime shall not be excluded from consideration by a jury or court due to a failure to prove the chain of custody of the evidence. Whenever a witness in a criminal trial identifies a physical piece of evidence connected with or collected in the investigation of a crime, the evidence shall be submitted to the jury or court *848 for whatever weight the jury or court may deem proper. The trial court in its charge to the jury shall explain any break in the chain of custody concerning the physical evidence."
§ 12-21-13, Ala.Code 1975.

A.
First, the appellant asserts that the State did not establish a chain of custody for the shotgun and the shotgun shells. Lieutenant Dwight Woods of the Dallas County Sheriff's Department, who was the first person to arrive at the pawnshop, saw the shotgun and the shotgun shells and secured the scene. Lieutenant Investigator Roy Friene of the Dallas County Sheriff's Department, who investigated the offenses, testified that the department took custody of the shotgun and the shotgun shells at the pawnshop. He also testified that they were sent to the laboratory to be tested for latent fingerprints. Katherine Richert, a firearms and toolmarks examiner employed by the Alabama Department of Forensic Sciences, testified that she received the shotgun and the shotgun shells from Shannon Fitzgerald, a latent print examiner. She also identified both the shotgun and the shotgun shells that were admitted into evidence during the trial as the ones she examined. Further, Friene testified that the department received the shotgun back from the firearms laboratory. He also identified at least one of the shotgun shells that was recovered from the pawnshop. Finally, the defense did not object to the admission of the shotgun or the shotgun shells into evidence. This testimony was sufficient to establish a reasonable probability that the items had not been tampered with or altered. Accordingly, we do not find that there was any plain error in the admission of the shotgun and the shotgun shells into evidence.

B.
Second, the appellant asserts that the State did not establish a chain of custody for the videotape from the pawnshop. We addressed a similar argument in Woods v. State, 548 So.2d 611, 614 (Ala.Crim.App.1989), as follows:
"The appellant argues that the trial court erred in admitting a videotape into evidence ... because, he argues, the proper foundation had not been laid. The appellant contends that the recording should be subject to the same foundational analysis as a tape recording. He also argues that a proper chain of custody was not established for its introduction. However, this court has determined that video recordings are admissible under the rules for the admission of photographic evidence. Molina v. State, 533 So.2d 701 (Ala.Cr.App.1988).
"`We adopt the "better reasoned rule" that "video recordings are admissible on the same basis as other types of photographic evidence, i.e. admissible when verified by some witness who can state that they are a reliable reproduction of the recorded picture and sound." C. Scott, Photographic Evidence, supra, § 1297 at 98 n. 42.20 (1987 Pocket Part).
"`"....
"`Accordingly, we reaffirm the predicate for admitting videotape [motion picture] evidence announced by our Supreme Court in U.A.W.-C.I.O. v. Russell, [264 Ala. 456, 88 So.2d 175 (1956), aff'd, 356 U.S. 634, 78 S.Ct. 932, 2 L.Ed.2d 1030 (1958),] and we specifically reject the dicta in Voudrie v. State, 387 So.2d [248] at 256, and cases following it, that have upheld the more stringent seven-pronged predicate for admitting sound recordings....

*849 "`The videotape was thus admissible without a showing of its chain of custody. "[A] proper foundation laid for the accuracy of what the film portrays obviates the need to establish a chain of custody to demonstrate its authenticity." State v. Deering, 291 N.W.2d 38, 41 (Iowa 1980). Accord, Mikus v. United States, 433 F.2d 719, 725-26 (2d Cir.1970); Paramore v. State, 229 So.2d 855, 859 (Fla.1969), vacated on other grounds, 408 U.S. 935, 92 S.Ct. 2857, 33 L.Ed.2d 751 (1972); Bremer v. State, 18 Md.App. 291, 307 A.2d 503, 535 (1973), cert. denied, 415 U.S. 930, 94 S.Ct. 1440, 39 L.Ed.2d 488 (1974) (Videotape of attempted assassination of Governor George Wallace admitted without proving chain of custody of the film).'
"Molina v. State, supra, at 712."
In this case, Friene testified that a deputy removed a videotape from surveillance equipment in the pawnshop; that the sheriff's department took custody of the videotape; that they showed it to Helen King; and that the department still had custody of the videotape. King testified that the video equipment in the pawnshop was working on the day of the offenses; that the video equipment monitored the offenses; that she had reviewed the videotape of the offenses; and that the videotape of the offenses accurately depicted what occurred at that time. That authentication testimony established that the videotape was a reliable reproduction of the offenses and obviated the need for the State to establish a chain of custody for the videotape. Accordingly, we do not find that there was any plain error in its admission into evidence.

C.
Third, the appellant asserts that the State did not establish a chain of custody for the Miranda rights card and his written statement about the offenses. However, Friene identified State's Exhibit # 25 as the card he used to advise the appellant of his rights and to record the appellant's waiver of his rights, and he testified that it was in the same or substantially the same condition as when he completed it. He also identified State's Exhibit # 26 as the appellant's statement about the offenses, and he testified that it was in the same or substantially the same condition as when he completed it. Therefore, both exhibits were admissible pursuant to § 12-21-13, Ala.Code 1975, and we do not find that there was any plain error in their admission into evidence.

D.
Fourth, the appellant asserts that the State did not establish a chain of custody for photographs of the crime scene and still photographs that were made from the videotape of the offenses.
"Regarding the admissibility of photographs and films, this court stated in Molina v. State, 533 So.2d 701, 711 (Ala.Cr.App.), cert. denied, (Ala.1988), cert. denied, [489] U.S. [1086], 109 S.Ct. 1547, 103 L.Ed.2d 851 (1989):
"`"As long as satisfactory evidence of the integrity of a film or videotape is presented, stringent foundational requirements, such as proof of a continuous chain of custody, are now almost universally rejected as unnecessary...." C. Scott, 3 Photographic Evidence § 1297 at 95 (2d ed. 1969) (1987 Pocket Part). See also State v. Young, 303 A.2d 113 (Me.1973) (chain of custody proved in the absence of eyewitness verification); State v. Bunting, 187 N.J.Super. 506, 455 A.2d 531 (N.J.Super.Ct.1983) (same).'"
Williams v. State, 565 So.2d 282, 285 (Ala.Crim.App.1990).
*850 In this case, Friene testified that members of the department took photographs of the crime scene and made still photographs from the videotape of the offenses. Further, various witnesses testified that the photographs accurately depicted the crime scene. Therefore, we do not find that there was any plain error in their admission into evidence.

E.
Fifth, the appellant asserts that the State did not establish a chain of custody for the victims' bodies.
"`"The purpose for requiring that the chain of custody be shown is to establish to a reasonable probability that there has been no tampering with the evidence." Ex parte Jones, 592 So.2d 210, 212 (Ala.1991); Harrell v. State, 608 So.2d 434, 437 (Ala.Crim.App.1992); Smith v. State, 583 So.2d 990 (Ala.Crim.App.1991), cert. denied, 583 So.2d 993 (Ala.1991). Moreover, the evidence need not negate the remotest possibility of substitution, alteration, or tampering, but instead must prove to a reasonable probability that the item is the same as it was at the beginning of the chain. Harrell, at 437; Ex parte Williams, 548 So.2d 518 (Ala.1989). Evidence has been held correctly admitted even when the chain of custody has a weak or missing link. Gordon v. State, 587 So.2d 427, 433 (Ala.Crim.App.1990), rev'd 587 So.2d 434 (Ala.), on remand, 587 So.2d 435 (Ala.Crim.App.), appeal after remand, 591 So.2d at 149 (Ala.Crim.App.1991); Shute v. State, 469 So.2d 670, 674 (Ala.Crim.App.1984). In Gordon, this court held that because there was no evidence that the victim's body had been tampered with in any way, a sufficient chain of custody had been established. Gordon, 587 So.2d at 433.'
"Slaton v. State, 680 So.2d 879, 893 (Ala.Cr.App.1995), aff'd, 680 So.2d 909 (Ala.1996), cert. denied, [519] U.S. [1079], 117 S.Ct. 742, 136 L.Ed.2d 680 (1997)."
Davis v. State, 718 So.2d 1148, 1161 (Ala.Crim.App.1995), aff'd, 718 So.2d 1166 (Ala.1998).
In this case, King testified that various crime scene photographs accurately depicted the victims' bodies after the offenses. Also, Friene testified that the photographs accurately depicted the victims' bodies as he observed them when he arrived at the scene. He further testified that the bodies were removed and transferred to the Alabama Department of Forensic Sciences for autopsies. Dr. Gregory Wanger testified that he performed autopsies on the victims' bodies at the department's laboratory in Montgomery.[12] The record does not suggest that the bodies were tampered with or altered before they arrived at the laboratory where Wanger performed the autopsies. Finally, the appellant does not allege that the bodies were tampered with or altered, and he has not explained how he has been denied a substantial right or how the failure to show a chain of custody for the bodies has affected the fairness and integrity of his trial so as to rise to the level of plain error. Therefore, we do not find that there was any plain error in this regard.

F.
Sixth, the appellant asserts that the State did not establish a chain of custody *851 for samples from the victims' bodies that the toxicologist tested. For the reasons set forth in Part XIV of this opinion, error, if any, in this regard was invited by the appellant and did not rise to the level of plain error.

XIV.
The appellant's fourteenth argument is that the trial court erred in allowing the medical examiner to testify about toxicology reports he had not prepared and in admitting those reports into evidence. Specifically, he contends that the reports constituted inadmissible hearsay and that their admission violated his right to confront the witnesses against him. Because he did not present this argument to the trial court, we review it for plain error. See Rule 45A, Ala. R.App. P.
During the defense's cross-examination of the medical examiner, Dr. Gregory Wanger, the following occurred:
"[DEFENSE COUNSEL]: Did you do a test on the two deceased persons for drugs and alcohol?
"[WANGER]: Yes, sir; I checked for that and that was sent to the toxicologist.
"[PROSECUTOR]: We have no objections to it being pursuant to our previous conversation.
"[DEFENSE COUNSEL]: And what were the results of the toxicology report on Mr. Ellis?
"[WANGER]: The toxicology report is a chemical study done to determine if there's alcohol or drugs present in the blood or other materials that I submitted. On Mr. Ellis, the ethyl alcohol which is drinking alcohol was negative and no drugs were detected."
(R. 243-44.) Thereafter, on redirect examination by the State, the following occurred:
"[PROSECUTOR]: You said there were no drugs or alcohol found on the examination of Mr. Ellis. What about Mrs. Thompson?
"[WANGER]: Mrs. Thompson had the same finding, analysis for ethyl alcohol, which is drinking alcohol, was negative and there were no drugs detected.
"[PROSECUTOR]: All right.
"(WHEREUPON State's Exhibits 19 through 22 were marked for identification.)
"[PROSECUTOR]: Regarding the two reports, copies, those are copies of reports concerning what you just testified about, 19 and 20 showing 
"[WANGER]: These are scientific analyses from the toxicology report.
"[PROSECUTOR]: Move the introduction of 19 and 20.
"THE COURT: Admitted."
(R. 244-45.)
In this case, defense counsel invited any error in this regard because he made the first references to the toxicology reports and the results of those reports.
"Under the doctrine of invited error, a defendant cannot by his own voluntary conduct invite error and then seek to profit thereby. There are numerous decisions which hold that a defendant cannot predicate error upon admission of testimony that is elicited by defense counsel and is responsive to defense questions. See, e.g., Ringer v. State, 489 So.2d 646 (Ala.Crim.App.1986); Lacy v. State, 484 So.2d 1192 (Ala.Crim.App.1986); Crittenden v. State, 414 So.2d 476 (Ala.Crim.App.1982); Williams v. State, 383 So.2d 547 (Ala.Crim.App.1979), affirmed, Ex parte Williams, 383 So.2d 564 (Ala.1980), cert. denied, 449 U.S. 995, 101 S.Ct. 534, 66 L.Ed.2d 293 (1980)."
*852 Phillips v. State, 527 So.2d 154, 156-57 (Ala.1988). Moreover, he did not object when the State subsequently offered the reports as exhibits. Therefore, we do not find that there was any plain error in this regard.

XV.
The appellant's fifteenth argument is that the trial court improperly denied his requests for funds to hire an investigator and a mitigation expert. We addressed a similar argument in Finch v. State, 715 So.2d 906, 910-11 (Ala.Crim.App.1997), as follows:
"The appellant ... argues the trial court denied him his right to a fair trial by denying his pretrial `Motion For Funds For Expert Assistance To Investigate Grand and Petit Jury Venires.' The motion requested funds to employ an investigator, a statistician, a sociologist, and a jury selection expert to challenge the constitutionality of the current method of selection of the grand jury and petit jury venires in Jefferson County. The appellant's argument is without merit.
"In [Ex parte] Moody, [684 So.2d 114 (Ala.1996),] the Alabama Supreme Court defined the standard by which a trial court must assess an indigent defendant's request for expert assistance.
"`Although the [United States] Supreme Court has not specifically stated what "threshold showing" must be made by the indigent defendant with regard to the need for an expert, the Court refused to require the state to pay for certain experts when the indigent defendant "offered little more than undeveloped assertions that the requested assistance would be beneficial." Caldwell v. Mississippi, 472, U.S. 320 at 323, 105 S.Ct. 2633 at 2637, 86 L.Ed.2d 231 (1985). As we stated in Dubose [v. State, 662 So.2d 1189 (Ala.1995)] the Supreme Court cases of Ake [v. Oklahoma, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985)] and Caldwell, viewed together, seem to hold that an indigent defendant must show more than a mere possibility that an expert would aid in his defense. "Rather, the defendant must show a reasonable probability that an expert would aid in his defense and [must show that] a denial of an expert to assist at trial would result in a fundamentally unfair trial." Dubose, 662 So.2d at 1192, citing Moore v. Kemp, 809 F.2d 702 (11th Cir.), cert. denied, 481 U.S. 1054, 107 S.Ct. 2192, 95 L.Ed.2d 847 (1987).
"`....
"`Based on the foregoing, we conclude that for an indigent defendant to be entitled to expert assistance at public expense, he must show a reasonable probability that the expert would be of assistance in the defense and that the denial of expert assistance would result in a fundamentally unfair trial. To meet this standard, the indigent defendant must show, with reasonable specificity, that the expert is absolutely necessary to answer a substantial issue or question raised by the state or to support a critical element of the defense. If the indigent defendant meets this standard, then the trial court can authorize the hiring of an expert at public expense.'
"684 So.2d at 119. See also Burgess v. State, [723] So.2d [742] (Ala.Cr.App.1997); MacEwan v. State, 701 So.2d 66 (Ala.Cr.App.1997); Ex parte Dobyne, 672 So.2d 1354, 1357 (Ala.1995), cert. denied, 517 U.S. 1169, 116 S.Ct. 1571, 134 L.Ed.2d 670 (1996).
"Applying this standard to the appellant's request for expert assistance, we *853 cannot say that, by refusing his request, the trial court denied the appellant his right to a fair trial.... The appellant has failed to show with reasonable specificity that the experts he requested would have provided information related to any question or issue raised by the State at trial or would have been relevant to any element of the crimes for which he was charged. Rather, the appellant's argument is based merely on an `expectation' that the requested assistance would have been beneficial to his defense. Caldwell, supra. In a similar case, this court recently upheld an order denying funds for a statistical expert requested by an indigent defendant to assist in challenging the jury venire in Tuscaloosa County. See May v. State, 710 So.2d 1362, 1366 (Ala.Cr.App.1997). In May, we stated that the defendant failed to `make a threshold showing... that the statistical expert would be of assistance' because his `request was supported solely by his assertion that the venire was not a fair cross-section of the community.' Id. Furthermore, we have already held that the random selection of jurors from a list of licensed drivers is an acceptable manner by which to select a jury venire. Sistrunk v. State, 630 So.2d 147 (Ala.Cr.App.1993).
"Therefore, the trial court did not deprive the appellant of his right to a fair trial by denying his request for expert assistance to investigate the juror selection process in Jefferson County."
Similarly, in this case, the appellant did not make a threshold showing that either of the requested experts would probably assist his defense and that the denial of funds to hire the experts would result in a fundamentally unfair trial. Rather, he simply speculated that the experts would assist his defense. Therefore, because the appellant did not make the required showing of need, the trial court did not abuse its discretion in denying his requests for expert assistance.

XVI.
The appellant's sixteenth argument is that the trial court improperly denied his pretrial requests regarding veniremembers.

A.
First, the appellant contends that the trial court improperly denied his "Motion to Disqualify All Potential Jurors Who Knew or Were Acquainted with the Victims or Their Family." We addressed a similar argument in Taylor v. State, 808 So.2d 1148, 1184-85 (Ala.Crim.App.2000), aff'd, 808 So.2d 1215 (Ala.2001), as follows:
"Taylor argues that the trial court erred when it denied his pretrial motion to disqualify `all potential jurors who were acquainted with either the victims or who know any of the victim's immediate family members.' Taylor argues that because these persons would have known the deceased's standing and reputation in the community and because they would be tainted by the grief of family members, they should have been automatically disqualified.
"`"[T]he mere fact that a prospective juror is personally acquainted with the victim [or his family] does not automatically disqualify a person from sitting on a criminal jury." Brownlee v. State, 545 So.2d 151, 164 (Ala.Cr.App.1988), affirmed, 545 So.2d 166 (Ala.), cert. denied, 493 U.S. 874, 110 S.Ct. 208, 107 L.Ed.2d 161 (1989).... Instead, the test is "whether the [prospective] juror's acquaintance with [the victim] or relative is such that it would result in probable prejudice." Vaughn v. Griffith, 565 So.2d 75, 77 (Ala.1990), cert. denied, 498 U.S. 1097, *854 111 S.Ct. 987, 112 L.Ed.2d 1072 (1991).'
"Morrison v. State, 601 So.2d 165, 168 (Ala.Cr.App.1992) (citations omitted). Because a veniremember's mere acquaintance with a victim or a family member of a victim is not sufficient to justify a strike for cause, the trial judge did not err when it denied Taylor's motion. There is no error here."
As we did in Taylor, we conclude that the trial court did not err in denying the appellant's motion in this case.

B.
Second, the appellant contends that the trial court improperly denied his request for a jury questionnaire. However, trial courts are not required to allow the use of jury questionnaires, even in capital cases. In Ex parte Land, 678 So.2d 224, 241-42 (Ala.1996), the Alabama Supreme Court addressed this argument as follows:
"Land also argues that the trial court's refusal to allow the use of a jury questionnaire form ... prevented him from selecting a fair and impartial jury and, thus, violated his rights guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and rights guaranteed by Alabama law. He contends that the use of a jury questionnaire... was required in order for him to be able to conduct an effective voir dire designed to detect bias arising from pretrial publicity, without contaminating the entire venire....
"....
"A trial court is vested with great discretion in determining how voir dire examination will be conducted, and that court's decision on how extensive a voir dire examination is required will not be overturned except for an abuse of that discretion. Fletcher v. State, 291 Ala. 67, 277 So.2d 882 (1973); Lane v. State, 644 So.2d 1318 (Ala.Cr.App.1994); Harris v. State, 632 So.2d 503 (Ala.Cr.App.1992), affirmed, 632 So.2d 543 (Ala.1993), affirmed, [513] U.S. [504], 115 S.Ct. 1031, 130 L.Ed.2d 1004 (1995). After reviewing the record, we conclude that the trial court did not abuse its discretion in this regard."
See also Siebert v. State, 562 So.2d 586 (Ala.Crim.App.1989), aff'd, 562 So.2d 600 (Ala.1990).
In this case, the trial court conducted voir dire examination in panels and allowed the parties to question the veniremembers extensively. It also allowed them to conduct individual voir dire examination when necessary. From our examination of the transcript of the voir dire proceedings, we are satisfied that the method of the examination and the empaneling of the jury "provided reasonable assurance that prejudice would have been discovered if present." Haney v. State, 603 So.2d 368, 402 (Ala.Crim.App.1991), aff'd, 603 So.2d 412 (Ala.1992). Accordingly, the trial court did not err in denying the appellant's motion for a jury questionnaire.

XVII.
The appellant's seventeenth argument is that the trial court did not properly admonish the jury, as required by Rule 19.3(b), Ala. R.Crim. P. Specifically, he contends that the trial court did not instruct the jurors not to discuss the case among themselves; not to form or express opinions until the case was submitted for decision; and, during the penalty phase, to avoid media accounts about the case. Because he did not present these arguments to the trial court, we review them for plain error. See Rule 45A, Ala. R.App. P.
*855 Rule 19.3(b), Ala. R.Crim. P., provides, in pertinent part:
"In all cases, the court shall admonish the jurors that they are not:
"(1) To discuss among themselves any subject connected with the trial until the case is submitted to them for deliberation;
"(2) To converse with anyone else on any subject connected with the trial, until they are discharged as jurors in the case;
"(3) To knowingly expose themselves to outside comments or to news accounts of the proceedings, until they are discharged as jurors in the case; or
"(4) To form or express any opinion on the case until it is submitted to them for deliberation."

A.
First, the record refutes the appellant's assertion that the trial court did not instruct the jurors not to discuss the case among themselves. In fact, the trial court repeatedly instructed the jurors not to discuss the case among themselves. (S.R. 20, 34, 62, 121, 150, 180; R. 289, 341.) Therefore, we do not find that there was any plain error in this regard.

B.
Second, the record shows that the trial court adequately instructed the jurors to avoid media accounts about the case throughout the trial. During the general qualification of the venire, the trial court specifically stated:
"I read to you the specific charges. As I said, this is a capital case and I'm sure it will attract some media attention. It's already done so.
"I told you earlier before we took a break to avoid discussing the case or allowing anyone to discuss it with you, and I'm also now instructing you to avoid all news media if you're successfully chosen as a juror in this case.

"We expect that we'll select a jury today. It will probably be a long process for y'all, so we'll try to take breaks when we need to. We'll try to move it along. But we're going to take as much time as we need.
"Ordinarily we can get this done by late this afternoon, but I will ask you to avoid any newspaper accounts of the case, and any radio or television accounts until we've selected a jury. Then the ones that are actually selected on this jury, that instruction will remain with you until such time as your services are concluded."
(R. 34) (emphasis added). These instructions were sufficient to admonish the jurors to avoid any contact with the media throughout both the guilt and penalty phases of the trial. Therefore, we do not find that there was any plain error in this regard.

C.
Third, it appears that the trial court did not specifically instruct the jurors not to form or express opinions until the case was submitted for decision. However, it repeatedly instructed them not to discuss the case and to avoid any media accounts about the case, as discussed herein. It also instructed them that they should make a decision based solely on the evidence presented in the case and that the arguments of the attorneys did not constitute evidence. Based on these instructions, we do not find that the trial court's omission rose to the level of plain error. See Griffin v. State, 790 So.2d 267 (Ala.Crim.App.1999), rev'd on other grounds, 790 So.2d 351 (Ala.2000).

*856 XVIII.
The appellant's eighteenth argument is that the trial court improperly overrode the jury's sentencing recommendation for several reasons.

A.
First, the appellant contends that the trial court did not state what consideration it gave to the jury's recommendation and its specific reasons for doing so. However, we remanded this case for the trial court to amend its sentencing order to comply with the requirements of Ex parte Taylor, 808 So.2d 1215 (Ala.2001). In its amended sentencing order, the trial court stated:
"This Court's sentencing order entered October 11, 2000, shall remain in full force and effect as if set out fully herein. The Court amends that order to provide the specific reasons for giving the jury's recommendation the consideration it did. The Court is and was extremely mindful of the jury's recommendation in this case. The Court considered the fact that the vote was seven for life without parole and five for the death penalty, the minimum vote for a life without parole recommendation. It appeared clearly to the Court that the aggravating circumstance outweighed the mitigating circumstances beyond a reasonable doubt. It is the Court's opinion that the advisory verdict of the jury should not be followed. As stated in the original sentencing order: `The Defendant, with cold precision and premeditation, using a weapon designed for the sole purpose of extinguishing human life, mercilessly gunned down 3 people who were doing nothing more than trying to earn a living. As vividly shown by the surveillance video, he opened fire upon entering the door. He emptied his weapon, firing as quickly as he could, shot after shot. Miraculously Helen King was spared and he only snuffed out the lives of two yet, in those few seconds of mayhem, he destroyed the lives of many.' He planned his crime. He went to the store earlier in the day and pretended to shop for a ring. Instead, he was looking it over with an eye to return to commit his crime. When he returned, he fired immediately upon entering, with no warning and no questions asked. His intent was obvious; to take out the victims and steal what he could.
"The legislature of the State of Alabama made the recommendation of the jury advisory only. The United States Supreme Court has ruled that the Alabama law, which vests sentencing authority in the trial judge but requires the judge to consider advisory jury verdicts, does not violate the Eighth Amendment [to] the United States Constitution and has specifically upheld Alabama's capital murder sentencing procedure. One reason for this is the importance that the death penalty be administered with an even hand. This case deserves the death penalty. The Court has considered the facts of this case and the actions of the Defendant and compared them to similar cases. The sentence is proportionate to sentences given in other murder during robbery capital murder convictions in this County, this Circuit and this State. In fact, the Alabama Court of Criminal Appeals, in a decision rendered October 26, 2001, Hodges v. State, 856 So.2d 875, 936 (Ala.Crim.App.2001), stated: `In fact, two-thirds of Alabama's death sentences have been imposed on defendants convicted of murder made capital because it was committed during the commission of a robbery.' While the Court respects the sentencing recommendation given by the jury and gave it due consideration, the ultimate decision *857 turned, as it must and as it is required, on whether the aggravating circumstance outweighed the mitigating circumstances. The Court finds that it did which is another reason for giving the jury's recommendation the weight it was given. Based on all of the above, as well as the findings in the original sentencing order, it is the opinion of the Court that a greater sentence than life without parole is warranted in this case."
(Return to remand.) This order satisfies the requirements of Ex parte Taylor. Therefore, the appellant's argument is without merit.

B.
Second, the appellant contends that the trial court erred because it allegedly considered improper victim impact testimony, race, proportionality, and non-statutory aggravating circumstances in overriding the jury's recommendation and sentencing him to death. Because he did not present this argument to the trial court, we review it for plain error. See Rule 45A, Ala. R.App. P.
We have thoroughly reviewed the trial court's original and amended sentencing orders. That review does not support the appellant's allegations of impropriety. Rather, that review shows that the appellant has isolated certain comments, taken them out of context, and attempted to predicate error on them. Therefore, we do not find that there was any plain error in this regard.

C.
Finally, the appellant contends that the judicial override violates equal protection principles, due process principles, and § 11 of the Alabama Constitution. These arguments have previously been decided adversely to him. See Harris v. Alabama, 513 U.S. 504, 115 S.Ct. 1031, 130 L.Ed.2d 1004 (1995); Ex parte Apicella, 809 So.2d 865 (Ala.2001).
Furthermore,
"[i]n several recent decisions, both this Court and the Alabama Supreme Court have agreed with the State's argument that Ring did not invalidate Alabama's law, which vests the ultimate sentence determination in the hands of the trial judge, and not a jury. See, e.g., Ex parte Hodges, 856 So.2d 936 (Ala.2003); Ex parte Waldrop, 859 So.2d 1181 (Ala.2002); Turner v. State, [Ms. CR-99-1568, November 22, 2002] ___ So.2d ___ (Ala.Crim.App.2002); Stallworth v. State, 868 So.2d 1128 (Ala.Crim.App.2001), opinion on return to second remand, 868 So.2d 1178. In each of those cases, we recognized the narrowness of the holding in Ring, noting that `[t]he Ring Court held that any aggravating circumstance that increased a sentence to death must be proved to a jury beyond a reasonable doubt'; however, we noted that the Ring Court `did not reach the question whether judicial sentencing or judicial override was constitutional.' Stallworth v. State, 868 So.2d at 1183 (opinion on return to second remand). Indeed, we quote the following language from a footnote in Ring:

"`Ring's claim is tightly delineated: He contends only that the Sixth Amendment required jury findings on the aggravating circumstances asserted against him. No aggravating circumstance related to past convictions in his case; Ring therefore does not challenge Almendarez-Torres v. United States, 523 U.S. 224, 118 S.Ct. 1219, 140 L.Ed.2d 350 (1998), which held that the fact of prior conviction may be found by the judge even if it increases the statutory maximum sentence. He makes no Sixth Amendment *858 claim with respect to mitigating circumstances. See Apprendi v. New Jersey, 530 U.S. 466, 490-491, n. 16, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000) (noting "the distinction the Court has often recognized between facts in aggravation of punishment and facts in mitigation" (citation omitted [in Ring])). Nor does he argue that the Sixth Amendment required the jury to make the ultimate determination whether to impose the death penalty. See Proffitt v. Florida, 428 U.S. 242, 252, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976) (plurality opinion) ("[I]t has never [been] suggested that jury sentencing is constitutionally required."). He does not question the Arizona Supreme Court's authority to reweigh the aggravating and mitigating circumstances after that court struck one aggravator. See Clemons v. Mississippi, 494 U.S. 738, 745, 110 S.Ct. 1441, 108 L.Ed.2d 725 (1990). Finally, Ring does not contend that his indictment was constitutionally defective. See Apprendi, 530 U.S. at 477, n. 3, 120 S.Ct. 2348 (Fourteenth Amendment "has not ... been construed to include the Fifth Amendment right to `presentment or indictment of a Grand Jury'").'
"536 U.S. at 597 n. 4, 122 S.Ct. 2428 (emphasis added)."
Martin v. State, [Ms. CR-99-2249, May 30, 2003] ___ So.2d ___, ___ (Ala.Crim.App.2003). See also Lewis v. State, 889 So.2d 623 (Ala.Crim.App.2003).
Finally, we instructed the parties to file supplemental briefs addressing the applicability of Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), to this case. In this case, the trial court found that one aggravating circumstance existed  the appellant committed the capital offenses while he was engaged in the commission of a robbery or an attempted robbery. See § 13A-5-49(4), Ala.Code 1975. Because the jury convicted him of the capital offense of robbery-murder, that statutory aggravating circumstance was proven beyond a reasonable doubt. Therefore, in this case, the jury, and not the judge, determined the existence of the "aggravating circumstance necessary for imposition of the death penalty." Ring, 536 U.S. at 609, 122 S.Ct. at 2443. Furthermore, "Ring and Apprendi do not require that a jury weigh the aggravating circumstances and the mitigating circumstances." Ex parte Waldrop, 859 So.2d 1181, 1190 (Ala.2002). Therefore, there was not a Ring violation in this case.
For these reasons, the appellant's arguments about the judicial override in this case are without merit.

XIX.
The appellant's nineteenth argument is that "[t]he imposition of the death penalty on one who is mentally retarded violates the Eighth and Fourteenth Amendments and the State Constitution." (Appellant's brief at p. 115.) After this case was orally argued and submitted, the United States Supreme Court released its decision in Atkins v. Virginia, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002). In Atkins, the Supreme Court held:
"We are not persuaded that the execution of mentally retarded criminals will measurably advance the deterrent or the retributive purpose of the death penalty. Construing and applying the Eighth Amendment in the light of our `evolving standards of decency,' we therefore conclude that such punishment is excessive and that the Constitution `places a substantive restriction on the State's power to take the life' of a mentally retarded offender."
*859 536 U.S. at 321, 122 S.Ct. at 2252. Thereafter, we requested that the appellant and the attorney general brief the applicability of Atkins to this case. The parties submitted briefs in support of their respective positions, and we considered those briefs in reviewing this case.
In Ex parte Perkins, 851 So.2d 453, 456 (Ala.2002), the Alabama Supreme Court stated:
"[T]his Court can determine, based on the facts presented at Perkins's trial, that Perkins, even under the broadest definition of mental retardation, is not mentally retarded. Those states with statutes prohibiting the execution of a mentally retarded defendant require that a defendant, to be considered mentally retarded, must have significantly subaverage intellectual functioning (an IQ of 70 or below), and significant or substantial deficits in adaptive behavior. Additionally, these problems must have manifested themselves during the developmental period (i.e., before the defendant reached age 18)."
See also Ex parte Smith, [Ms. 1010267, March 14, 2003] ___ So.2d ___ (Ala.2003).
We have reviewed the record in light of Perkins and Smith. Based on the record before us, as did the Alabama Supreme Court in those cases, we conclude that the appellant's death sentence does not violate the Eighth Amendment. Although Dr. Blanton testified that his testing showed that the appellant had an IQ of 67 and that a reading, spelling, and math test showed that he was at the sixth grade level in reading and the second grade level in spelling and math, the appellant was 23 years of age at that time. Furthermore, Dr. Ronan testified that she administered "some items from IQ tests" to screen for mental retardation, but explained that she "didn't give him the whole test because [she] didn't feel like he needed those, he was not mentally retarded, he was in the more low average range. The school records would suggest that he's even higher than that." (R. 334.) She also testified that her findings were inconsistent with Dr. Blanton's findings; that one of the tests she had administered to the appellant had been invalidated probably "due to the exaggeration of the [appellant];" that the appellant had given differing accounts about his psychiatric history; and that the appellant was probably malingering or trying to appear to be less capable than he really is. (R. 333.)
In addition to the experts, Howard Mitchell, for whom the appellant had worked, testified that the appellant did not appear to be slow or mentally retarded, that he was a capable and responsible employee, and that he could follow instructions. Also, Van Smith, the appellant's high school principal, testified that the appellant was initially a good student, that he was in the advanced track preparing for college, that he was never tested for special education, that his grades declined in the eleventh and twelfth grades, and that he passed the high school exit examination the first time he took it. Further, the appellant's father testified that the appellant was "one of the smartest and best children [he] had" until about the eighth, ninth, or tenth grade; that he started using drugs in about the ninth or tenth grade; that he was not the same after that; and that he started having problems in school about that time. (R. 473.) Finally, the appellant's uncles testified that he was a smart child and a good worker when he was younger.
The majority of the evidence presented in this case does not indicate that the appellant has significantly subaverage intellectual functioning. In fact, it appears that any such deficits may be due to his voluntary use of drugs and/or alcohol *860 and/or to malingering. Also, the record does not indicate that the appellant has significant or substantial deficits in adaptive behavior. Finally, the record does not indicate that any such problems manifested themselves before the appellant reached the age of 18. The appellant does not satisfy even the broadest definition of mental retardation. Therefore, we conclude that his sentence does not violate the Eighth Amendment.

XX.
The appellant's twentieth argument is that the trial court erroneously relied upon "a highly prejudicial presentence investigation report." (Appellant's brief at p. 117.)

A.
Initially, the appellant contends that the presentence investigation report improperly included the opinion of Eddie Cook, Jr., the probation and parole officer, about his mental state at the time of the offenses and recommendation that he receive the maximum possible sentence. Because he did not present this argument to the trial court, we review it for plain error. See Rule 45A, Ala. R.App. P.
In his report, Cook stated:
"This offense involves Jeffrey Lee and his brother Andre Lee and cousin co-defendant Jerry Johnson being arrested on the charge of Capital Murder of a pawnshop owner, an employee and the Attempted Murder of another employee. The surveillance camera inside the pawnshop clearly identified Jeffrey Lee as the culprit that committed the brutal offense. In Jeffrey Lee's statement, he indicated that when he entered the pawnshop, the gun accidentally went off. It is this writer's opinion that Jeffrey Lee had every intention of committing this heinous offense by the way he shot the first victim and immediately shot the second victim and preceded to shoot the third victim. It is this writer's opinion that the maximum sentence imposed would be appropriate."
(S.C.R. 7.)
We addressed a similar situation in Kuenzel v. State, 577 So.2d 474, 527 (Ala.Crim.App.1990), as follows:
"The defendant contends that the trial judge should not have considered the presentence investigation report because it contains the parole officer's recommendation of punishment.
"... Nowhere in the record does there appear any objection to this or any other portion of the presentence report. However, this court has neither found nor been cited to any authority for the parole officer's recommendation. Although we do not approve or condone such a recommendation, we find that even if such recommendation constitutes error, we would find that error harmless in this case. Rule 45, A.R.A.P. `[T]he mere presence of information in the pre-sentence report which should not be considered for the purpose of enhancing punishment is not, per se, prejudicial.' Johnson v. State, 521 So.2d 1006, 1013 (Ala.Cr.App.1986), affirmed, 521 So.2d 1018 (Ala.), cert. denied, 488 U.S. 876, 109 S.Ct. 193, 102 L.Ed.2d 162 (1988)."
We have reviewed the original and amended sentencing orders with the appellant's arguments in mind. Those orders do not indicate that the trial court relied on Cook's opinion regarding the appellant's mental state at the time of the offenses or his recommendation regarding sentencing. Rather, it considered the evidence presented during the guilt and penalty phases of the trial, conducted an independent weighing of the aggravating and mitigating circumstances in this case, and considered the jury's advisory verdict. *861 Therefore, error, if any, in the fact that the presentence investigation report included Cook's opinion regarding the appellant's mental state at the time of the offenses and a recommendation regarding sentencing was harmless. See Rule 45, Ala. R.App. P.; Kuenzel, supra.

B.
The appellant also contends that the presentence investigation report was not sufficient because it "contained several errors and omissions which made it impossible for the trial court to properly decide whether to follow the jury's recommendation of life without parole or to sentence [him] to death." (Appellant's brief at p. 121.) Citing Guthrie v. State, 689 So.2d 935 (Ala.Crim.App.1996), aff'd, 689 So.2d 951 (Ala.1997), he asserts that Cook's "failure to complete a proper presentence report in accordance with Alabama law likely `hamstrung the trial court's consideration of the full mosaic' of [his] background and circumstances before it overrode the jury's sentence of life without parole." (Appellant's brief at p. 122.)
"`The purpose of the presentence investigation report is to aid the sentencing judge in determining whether the jury's advisory verdict is proper and if not, what the appropriate sentence should be.' Ex parte Hart, 612 So.2d 536, 539 (Ala.1992), cert. denied, 508 U.S. 953, 113 S.Ct. 2450, 124 L.Ed.2d 666 (1993)."
Jackson v. State, 791 So.2d 979, 1033 (Ala.Crim.App.2000).

i.
Initially, the appellant alleges that the presentence investigation report was not sufficient because it did not include information about the medications he was taking at the time of his sentencing and the fact he was under the care of a doctor who had diagnosed him as being borderline mentally retarded. However, in his written objection to the presentence report, the appellant brought this information to the trial court's attention. Further, during the sentencing hearing, the following occurred:
"[DEFENSE COUNSEL]: Your Honor, defendant would like to file a motion to object to the pre-sentence report and it's spelled out specifically. We're objecting to the fact that the pre-sentence report is incomplete. It doesn't describe the drugs that Jeffrey is on right now, and it doesn't get into the fact that he's seeing a doctor right now.
"Another doctor besides Dr. Blanton has diagnosed him as being borderline retarded. That's not in the report. And we feel since the report is incomplete, you haven't had a full picture to ponder. So, we would ask that another pre-sentence report be done. That's our objection.
"THE COURT: Wouldn't it be sufficient for me to consider things that you listed? I don't know anybody ever pointed out to Mr. Cook these facts.
"....
"[PROSECUTOR]: Of course, for the record, in response, I believe the person they're referring to understand the position they're referring to happens to be the jail physician, and I don't believe the diagnosis had anything to do with that. The medications they provided at the jail, we would dispute that. Certainly you can consider it for whatever it's worth. There's no evidence been presented about it, however."
(R. 488-89.) Therefore, the trial court had before it sufficient current information to aid it in determining whether the jury's advisory verdict was correct and what sentence to impose. See Jackson, supra. Accordingly, error, if any, in the omission of *862 this information from the presentence investigation report was harmless. See Rule 45, Ala. R.App. P.

ii.
The appellant also alleges that the presentence investigation report was insufficient because it indicated that Cook had not considered any psychological reports during his investigation and because the psychological reports were not incorporated into the report. However, he did not present this argument to the trial court. Therefore, we review it for plain error. See Rule 45A, Ala. R.App. P.
During the guilt phase of the trial, both the defense and the State presented extensive evidence about the appellant's mental state. Also, the appellant brought to the trial court's attention the fact that he was taking prescription medications; the fact that he was under the care of a doctor at the Cahaba Mental Health Facility; and the fact that that doctor had diagnosed him as being borderline mentally retarded. Further, in its sentencing order, the trial court stated:
"The Defendant presented evidence that the Defendant suffered from limited mental capacity. The evidence presented showed that he seemed fairly bright until he reached the age of about 14 or 15 and then began acting out in strange ways. Evidence was presented that he was in a low to borderline range of intellect so therefore the Court finds that there was evidence that supports this as a non-statutory mitigating circumstance."
(C.R. 125.) The trial court had before it sufficient information about the appellant's mental and psychological condition to aid it in determining the appropriate sentence to be imposed. See Jackson, supra. Therefore, error, if any, in the fact that Cook did not consider his psychological and mental history and the fact that the psychological reports were not incorporated into the report was harmless. See Rule 45, Ala. R.App. P. Accordingly, we do not find that there was any plain error in this regard.

iii.
Finally, the appellant alleges that the presentence investigation report included factual errors. Specifically, he contends that "the presentence report states that [he] is the father of only one child, (Supp. 7), when in fact he has two children." (Appellant's brief at p. 122.) Because he did not present this argument to the trial court, we review it for plain error. See Rule 45A, Ala. R.App. P.
During the penalty phase of his trial, the appellant presented evidence that he had two children. Also, in its sentencing order, the trial court stated:
"The Defendant presented evidence that he was a father of two small children.... The evidence clearly established that he had fathered two children and the Court takes that into consideration."
(C.R. 125.) Therefore, any error in the presentence report regarding the number of children the appellant had was harmless. See Rule 45, Ala. R.App. P. Accordingly, we do not find that there was any plain error in this regard.

XXI.
The appellant's twenty-first argument is that the trial court did not consider and find several statutory and nonstatutory mitigating circumstances. Specifically, he contends that the trial court improperly rejected the statutory mitigating circumstances that 1) he was under the influence of extreme mental or emotional disturbance at the time of the offenses and 2) his capacity to appreciate the criminality of his conduct or to conform his conduct to the *863 requirements of law was substantially impaired; did not give the mitigating circumstance of age the appropriate weight; and improperly rejected the nonstatutory mitigating circumstances that 1) he is a substance abuser who, at the time of the offenses, had been suffering from a drug and alcohol problem since his early teenage years, 2) at the time of sentencing, he was taking Zyprexa, Navane, Cogentin, and Remeron, and 3) he was under the care of Dr. Pineda, who diagnosed him as borderline mentally retarded. Because he did not present this argument to the trial court, we review it for plain error. See Rule 45A, Ala. R.App. P.
In reviewing this argument, we are guided by the following principles:
"A sentencer in a capital case may not refuse to consider or be `precluded from considering' mitigating factors. Eddings v. Oklahoma, 455 U.S. 104, 110, 102 S.Ct. 869, 874, 71 L.Ed.2d 1 (1982) (quoting Lockett v. Ohio, 438 U.S. 586, 604, 98 S.Ct. 2954, 2964-65, 57 L.Ed.2d 973 (1978)). The defendant in a capital case generally must be allowed to introduce any relevant mitigating evidence regarding the defendant's character or record and any of the circumstances of the offense, and consideration of that evidence is a constitutionally indispensable part of the process of inflicting the penalty of death. California v. Brown, 479 U.S. 538, 107 S.Ct. 837, 93 L.Ed.2d 934 (1987); Ex parte Henderson, 616 So.2d 348 (Ala.1992); Haney v. State, 603 So.2d 368 (Ala.Cr.App.1991), aff'd, 603 So.2d 412 (Ala.1992), cert. denied, 507 U.S. 925, 113 S.Ct. 1297, 122 L.Ed.2d 687 (1993). Although the trial court is required to consider all mitigating circumstances, the decision of whether a particular mitigating circumstance is proven and the weight to be given it rests with the sentencer. Carroll v. State, 599 So.2d 1253 (Ala.Cr.App.1992), aff'd, 627 So.2d 874 (Ala.1993), cert. denied, 510 U.S. 1171, 114 S.Ct. 1207, 127 L.Ed.2d 554 (1994). See also Ex parte Harrell, 470 So.2d 1309 (Ala.), cert. denied, 474 U.S. 935, 106 S.Ct. 269, 88 L.Ed.2d 276 (1985)."
Williams v. State, 710 So.2d 1276, 1347 (Ala.Crim.App.1996), aff'd, 710 So.2d 1350 (Ala.1997). See also Boyd v. State, 715 So.2d 825, 840 (Ala.Crim.App.1997), aff'd, 715 So.2d 852 (Ala.1998). Further,
"the decision as to whether a particular mitigating circumstance is sufficiently proven by the evidence and the weight to be accorded to it rests with the trial court. See Haney v. State, 603 So.2d 368 (Ala.Cr.App.1991), affirmed, 603 So.2d 412 (Ala.1992).
"`"`Although consideration of all mitigating circumstances is required by the United States Constitution, Lockett v. Ohio, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), the decision of whether a particular mitigating circumstance in sentencing is proven and the weight to be given it rests with the judge and jury. Lucas v. State, 376 So.2d 1149 (Fla.1979).' Smith v. State, 407 So.2d 894, 901 (Fla.1981)."'
"Harrell v. State, 470 So.2d 1303, 1308 (Ala.Cr.App.1984), affirmed, 470 So.2d 1309 (Ala.), cert. denied, 474 U.S. 935, 106 S.Ct. 269, 88 L.Ed.2d 276 (1985). See also McWilliams v. State, [640] So.2d [982] (Ala.Cr.App.1991)."
Giles v. State, 632 So.2d 568, 572 (Ala.Crim.App.1992), aff'd, 632 So.2d 577 (Ala.1993).
The sentencing order clearly refutes the appellant's argument. In its sentencing order, the trial court specifically stated that it considered all of the statutory and nonstatutory mitigating evidence presented. In fact, it found that two statutory *864 and several nonstatutory mitigating circumstances existed. Although it did not find that the two statutory mitigating circumstances about which the appellant complains existed, the sentencing order shows that it considered those statutory mitigating circumstances and explained why it determined that they did not exist. "`While Lockett and its progeny require consideration of all evidence submitted as mitigation, whether the evidence is actually found to be mitigating is in the discretion of the sentencing authority.' Bankhead v. State, 585 So.2d 97, 108 (Ala.Cr.App.1989)." Ex parte Slaton, 680 So.2d 909, 924 (Ala.1996). Although the trial court must consider all mitigating circumstances, it has discretion in determining whether a particular mitigating circumstance is proven and the weight it will give that circumstance. See Williams, supra. The trial court complied with Lockett v. Ohio, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), and its progeny in evaluating the statutory and nonstatutory mitigating evidence presented in this case. Therefore, we do not find that there was any plain error in this regard.

XXII.
The appellant's twenty-second argument is that the trial court erroneously instructed the jury on how it should consider and weigh aggravating and mitigating circumstances. However, the jury recommended a sentence of imprisonment for life without the possibility of parole. Therefore, error, if any, in the trial court's instructions was harmless. See Rule 45, Ala. R.App. P. See also Burgess v. State, 723 So.2d 742 (Ala.Crim.App.1997), aff'd, 723 So.2d 770 (Ala.1998).

XXIII.
The appellant's twenty-third argument is that the trial court improperly instructed the jury during its penalty phase instructions. Because the jury recommended a sentence of imprisonment for life without the possibility of parole, error, if any, in the trial court's instructions was harmless. See Rule 45, Ala. R.App. P. See also Burgess, supra.

XXIV.
The appellant's twenty-fourth argument is that the trial court "erred by failing to answer the jury's question" in his presence and that the record does not indicate that the jury was actually given an answer, who gave the answer and when, and what that person said. (Appellant's brief at p. 142.) Specifically, he contends that the trial court deprived him of his right to be present at all stages of the proceedings against him. Because he did not first present these arguments to the trial court, we review them for plain error. See Rule 45A, Ala. R.App. P.
During the jury's guilt phase deliberations, the following occurred:
"(WHEREUPON the following proceedings were held out of the presence and hearing of the jury. The defendant being present.)
"THE COURT: We don't have a verdict, we have a question. The question is, `Does capital murder mandate the death penalty?' I thought we went over that. My reply to that question is, `The jury will make a recommendation after the verdicts if the defendant is convicted of capital murder of either life without parole or the death penalty. Therefore, capital murder does not mandate the death penalty, it leaves that as an option.' Anybody have a problem with that?
"[PROSECUTOR]: No, sir.
"[DEFENSE COUNSEL]: Can you read that first part again?

*865 "[THE COURT:] The question is, `Does capital murder mandate the death penalty?' My reply is, `The jury will make a recommendation after the verdicts if [the] defendant is convicted of capital murder of either life without parole or the death penalty. Therefore, capital murder does not mandate the death penalty. It leaves that as an option.'
"[PROSECUTOR]: Do you need to put a separate hearing in there, Judge?
"THE COURT: All right. I've added, `There will be a separate hearing if the defendant is convicted in which the matter of sentencing is considered.'
"[DEFENSE COUNSEL]: Could you add if he's convicted of capital murder?
"THE COURT: I thought that's what I said. All right, I did."
(R. 410-11.) The next notation in the record indicates the time the jury returned with its verdict.
The record does not indicate that anyone spoke to the jury in response to the jury's question. Rather, it appears that the jury submitted its question to the trial court in written form and that the trial court submitted its response to the jury's question in written form. Further, the response appears to be what the trial court read with the additions the prosecutor and defense counsel suggested. Finally, defense counsel appeared to be satisfied with the procedure the trial court used. Therefore, we do not find that there was any plain error in this regard.

XXV.
The appellant's twenty-fifth argument is that the trial court should have ordered a change of venue for his trial.
"`A trial court is in a better position than an appellate court to determine what effect, if any, pretrial publicity might have in a particular case. The trial court has the best opportunity to evaluate the effects of any pretrial publicity on the community as a whole and on the individual members of the jury venire. The trial court's ruling on a motion for a change of venue will be reversed only when there is a showing that the trial court has abused its discretion. Nelson v. State, 440 So.2d 1130 (Ala.Cr.App.1983).'
"Joiner v. State, 651 So.2d 1155, 1156 (Ala.Cr.App.1994)."
Clemons v. State, 720 So.2d 961, 977 (Ala.Crim.App.1996), aff'd, 720 So.2d 985 (Ala.1998). "The mere fact that publicity and media attention were widespread is not sufficient to warrant a change of venue. Rather, Ex parte Grayson [, 479 So.2d 76 (Ala.1985),] held that the appellant must show that he suffered actual prejudice or that the community was saturated with prejudicial publicity." Slagle v. State, 606 So.2d 193, 195 (Ala.Crim.App.1992). "`Moreover, the passage of time cannot be ignored as a factor in bringing objectivity to trial.'" Whisenhant v. State, 555 So.2d 219, 224 (Ala.Crim.App.1988), aff'd, 555 So.2d 235 (Ala.1989) (quoting Dannelly v. State, 47 Ala.App. 363, 254 So.2d 434 (1971)).
"In connection with pretrial publicity, there are two situations which mandate a change of venue: 1) when the accused has demonstrated `actual prejudice' against him on the part of the jurors; 2) when there is `presumed prejudice' resulting from community saturation with such prejudicial pretrial publicity that no impartial jury can be selected. Sheppard v. Maxwell, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966); Rideau [v. Louisiana, 373 U.S. 723, 83 S.Ct. 1417, *866 10 L.Ed.2d 663 (1963)]; Estes v. Texas, 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965); Ex parte Grayson, 479 So.2d 76, 80 (Ala.), cert. denied, 474 U.S. 865, 106 S.Ct. 189, 88 L.Ed.2d 157 (1985); Coleman v. Zant, 708 F.2d 541 (11th. Cir.1983)."
Hunt v. State, 642 So.2d 999, 1042-43 (Ala.Crim.App.1993), aff'd, 642 So.2d 1060 (Ala.1994).

A.
We must first determine whether the pretrial publicity resulted in "presumptive prejudice." For prejudice to be presumed under this standard, the defendant must show: 1) that the pretrial publicity was prejudicial and inflammatory and 2) that the prejudicial pretrial publicity saturated the community where the trial was held. See Coleman v. Kemp, 778 F.2d 1487 (11th Cir.1985). Under this standard, a defendant carries an extremely heavy burden of proof.
"Hunt relies on the `presumed prejudice' standard announced in Rideau, and applied by the United States Supreme Court in Estes and Sheppard [v. Maxwell, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966)]. This standard was defined by the Eleventh Federal Circuit Court of Appeals in Coleman v. Kemp, 778 F.2d 1487 (11th Cir.1985), cert. denied, 476 U.S. 1164, 106 S.Ct. 2289, 90 L.Ed.2d 730 (1986). The court stated: `Prejudice is presumed from pretrial publicity when pretrial publicity is sufficiently prejudicial and inflammatory and the prejudicial pretrial publicity saturated the community where the trials were held.' 778 F.2d at 1490 (emphasis added [in Hunt]). See also Holladay v. State, 549 So.2d 122, 125 (Ala.Cr.App.1988), affirmed, 549 So.2d 135 (Ala.), cert. denied, 493 U.S. 1012, 110 S.Ct. 575, 107 L.Ed.2d 569 (1989).
"In determining whether the `presumed prejudice' standard exists the trial court should look at `the totality of the surrounding facts.' Patton v. Yount, 467 U.S. 1025, 104 S.Ct. 2885, 81 L.Ed.2d 847 (1984); Murphy v. Florida, 421 U.S. 794, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975); Irvin v. Dowd, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961). The presumptive prejudice standard is `rarely' applicable, and is reserved for only `extreme situations.' Coleman v. Kemp, 778 F.2d at 1537. `In fact, our research has uncovered only a very few ... cases in which relief was granted on the basis of presumed prejudice.' Coleman v. Kemp, 778 F.2d at 1490.
"Hunt had the burden of showing that `prejudicial pretrial publicity' saturated the community. Sheppard, supra. `[T]he burden placed upon the petitioner to show that pretrial publicity deprived him of his right to a fair trial before an impartial jury is an extremely heavy one.' Coleman v. Kemp, 778 F.2d at 1537. `Prejudicial' publicity usually must consist of much more than stating the charge, and of reportage of the pretrial and trial processes. `Publicity' and `prejudice' are not the same thing. Excess publicity does not automatically or necessarily mean that the publicity was prejudicial.
"....
"... In order to meet the burden of showing the necessity for a change of venue due to pretrial publicity on the grounds of community saturation, `the appellant must show more than the fact "that a case generates even widespread publicity."' Oryang v. State, 642 So.2d 979, 983 (Ala.Cr.App.1993), quoting, Thompson v. State, 581 So.2d 1216, 1233 (Ala.Cr.App.1991), cert. denied, [502] U.S. [1030], 112 S.Ct. 868, 116 L.Ed.2d 774 (1992).

*867 "`"Newspaper articles alone would not necessitate a change in venue unless it was shown that the articles so affected the general citizenry through the insertion of such sensational, accusational or denunciatory statements, that a fair and impartial trial was impossible. Patton v. State, 246 Ala. 639, 21 So.2d 844 [1945]."'
"Thompson, 581 So.2d at 1233, quoting McLaren v. State, 353 So.2d 24, 31 (Ala.Cr.App.), cert. denied, 353 So.2d 35 (Ala.1977).
"A review of the media coverage contained in the record on appeal demonstrates that the majority of print media coverage was reasonably factual and more or less objective. We find that the reportage by the news media did not result in the community being so `pervasively saturated' with prejudicial publicity so as to make the court proceedings nothing more than a `hollow formality.' Rideau, supra."
Hunt, 642 So.2d at 1043-44. "To justify a presumption of prejudice under this standard, the publicity must be both extensive and sensational in nature. If the media coverage is factual as opposed to inflammatory or sensational, this undermines any claim for a presumption of prejudice." United States v. Angiulo, 897 F.2d 1169, 1181 (1st Cir.1990).
The appellant filed a motion for a change of venue in which he argued that he had been prejudiced by pretrial publicity. Specifically, he contended that at least two area newspapers had published articles about the case and that radio and television stations had broadcast similar publicity in the area. However, he did not attach copies of the newspaper articles or transcripts of the broadcasts he referenced. His bare allegations about prejudicial publicity were not sufficient to prove that the media attention inflamed or saturated the community so that there was an emotional tide against him. Accordingly, he did not show that the pretrial publicity in this case was so inherently or presumptively prejudicial as to constitute one of those "extreme situations" that warrant a presumption of prejudice based on pretrial publicity.

B.
We must also determine whether the jury was actually prejudiced against the appellant.
"The `actual prejudice' standard is defined as follows:
"`To find the existence of actual prejudice, two basic prerequisites must be satisfied. First, it must be shown that one or more jurors who decided the case entertained an opinion, before hearing the evidence adduced at trial, that the defendant was guilty. Irvin v. Dowd, 366 U.S. [717,] 727, 81 S.Ct. [1639,] 1645, [6 L.Ed.2d 751, 758-59 (1961)]. Second, these jurors, it must be determined, could not have laid aside these preformed opinions and "render[ed] a verdict based on the evidence presented in court." Irvin v. Dowd, 366 U.S. at 723, 81 S.Ct. at 1643 [6 L.Ed.2d at 756].'
"Coleman v. Zant, 708 F.2d at 544."
Hunt, 642 So.2d at 1043.
"Furthermore, in order for a defendant to show prejudice, the `"proper manner for ascertaining whether adverse publicity may have biased the prospective jurors is through the voir dire examination." Anderson v. State, 362 So.2d 1296, 1299 (Ala.Crim.App.1978).' Ex parte Grayson, 479 So.2d 76, 80 (Ala.1985), cert. denied, 474 U.S. 865, 106 S.Ct. 189, 88 L.Ed.2d 157 (1985)."
*868 Oryang v. State, 642 So.2d 979, 983 (Ala.Crim.App.1993).
The appellant has not shown that any pretrial publicity actually prejudiced him. During the voir dire proceedings in this case, approximately one-half of the veniremembers indicated that they had read, heard, or learned something about the case. However, of those veniremembers, all who remained on the venire indicated that they could set aside that information and make a decision based solely on the evidence presented in the case. Accordingly, the appellant has not shown that any of the jurors were actually prejudiced against him.
For these reasons, the appellant did not show that the jurors were either presumptively or actually prejudiced against him. Therefore, the trial court did not abuse its discretion in denying the appellant's motion for a change of venue.

XXVI.
The appellant's twenty-sixth argument is that the trial court erroneously admitted into evidence photographs of the victims and the crime scene. In reviewing these photographs, we are guided by the following principles:
"`Photographic evidence is admissible in a criminal prosecution if it tends to prove or disprove some disputed or material issue, to illustrate some relevant fact or evidence, or to corroborate or dispute other evidence in the case. Photographs that tend to shed light on, to strengthen, or to illustrate other testimony presented may be admitted into evidence.... Finally photographic evidence, if relevant, is admissible even if it has a tendency to inflame the minds of the jurors.'"
Gaddy v. State, 698 So.2d 1100, 1148 (Ala.Crim.App.1995), aff'd, 698 So.2d 1150 (Ala.1997) (quoting Ex parte Siebert, 555 So.2d 780, 783-84 (Ala.1989)).
"`[P]hotographs depicting the character and location of wounds on a deceased's body are admissible even though they are cumulative and are based on undisputed matters. Magwood [v. State], 494 So.2d [124, 141 (Ala.Cr.App.1985), affirmed, 494 So.2d 154 (Ala.), cert. denied, 479 U.S. 995, 107 S.Ct. 599, 93 L.Ed.2d 599 (1986)]. The fact that a photograph is gruesome is not grounds to exclude it as long as the photograph sheds light on issues being tried. Id. Also, a photograph may be gruesome and ghastly, but this is not a reason to exclude it as long as the photograph is relevant to the proceedings, even if it tends to inflame the jury. Id.'
"Ex parte Bankhead, 585 So.2d 112 (Ala.1991). Accord, Ex parte Siebert, 555 So.2d 780, 783-84 (Ala.1989), cert. denied, [497] U.S. [1032], 110 S.Ct. 3297, 111 L.Ed.2d 806 (1990); McElroy's at § 207.01(2)."
Parker v. State, 587 So.2d 1072, 1092-93 (Ala.Crim.App.1991), opinion extended after remand, 610 So.2d 1171 (Ala.Crim.App.), aff'd, 610 So.2d 1181 (Ala.1992). Photographs that depict the crime scene are relevant and therefore admissible. See Ex parte Siebert, 555 So.2d 780, 783-84 (Ala.1989); Aultman v. State, 621 So.2d 353 (Ala.Crim.App.1992); Hill v. State, 516 So.2d 876 (Ala.Crim.App.1987). Finally,
"`"[p]hotographic evidence, if relevant, is admissible even if it has a tendency to inflame the minds of the jurors." Ex parte Siebert, 555 So.2d 780, 784 (Ala.1989), cert. denied, 497 U.S. 1032, 110 S.Ct. 3297, 111 L.Ed.2d 806 (1990). See generally C. Gamble, McElroy's Alabama Evidence, § 207.01(2) (4th ed.1991). "The photographs of the victim were properly *869 admitted into evidence. Photographic exhibits are admissible even though they may be cumulative,... demonstrative of undisputed facts, ... or gruesome...." Williams v. State, 506 So.2d 368, 371 (Ala.Cr.App.1986), cert. denied, 506 So.2d 372 (Ala.1987).'
"DeBruce v. State, 651 So.2d 599, 607 (Ala.Cr.App.1993). See also Ex parte Bankhead, 585 So.2d 112 (Ala.1991). The court did not err in allowing photographs of the victim's body to be received into evidence."
Hutcherson v. State, 677 So.2d 1174, 1200 (Ala.Crim.App.1994), rev'd on other grounds, 677 So.2d 1205 (Ala.1996). See also Giles v. State, 632 So.2d 568 (Ala.Crim.App.1992), aff'd, 632 So.2d 577 (Ala.1993); Haney v. State, 603 So.2d 368 (Ala.Crim.App.1991), aff'd, 603 So.2d 412 (Ala.1992).
We have reviewed the photographs, and we find that they were relevant to depict the crime scene and the injuries each of the victims suffered. Therefore, the trial court did not err in admitting them into evidence.
The appellant also argues that the trial court erroneously admitted into evidence still shots made from the videotape of the crimes. Specifically, he contends that, because the still shots were cumulative to the videotape that was played for the jury, they served no purpose other than to inflame the passions of the jury. Because he did not object to the admission of the still shots during the trial, we review this argument for plain error. See Rule 45A, Ala. R.App.P.
We have reviewed each of the still shots made from the videotape. Each of those shots shows various scenes from inside of the pawnshop and from the parking lot both before and during the offenses, including the perpetrator carrying a shotgun, the perpetrator pointing the shotgun at the victims, and the perpetrator trying to take the cash register. Therefore, even though the still shots may have been cumulative to the videotape, they were highly relevant. Accordingly, we do not find that there was any plain error in this regard.
The appellant further argues that the trial court erroneously allowed Freine to "narrate for the jury what he believed was occurring in the photographs." (Appellant's brief at p. 145.) Specifically, he contends that Freine was not competent to testify about still photographs and that his testimony invaded the province of the jury. He did not initially object to Freine's testimony about what the various still shots depicted. However, subsequently, the following occurred:
"[DEFENSE COUNSEL]: Judge, I object to Mr. Freine here giving comments on each of these stills here. I mean the frame is in evidence. They just viewed the video.
"THE COURT: I think he's saying the frames speak for themselves.
"[PROSECUTOR]: I'll ask him a specific question about each one.
"THE COURT: You can ask him if there's any confusion about sequence, about the numbers. You can ask him to explain that, but as far as him saying what this photograph shows, I think the objection is well taken."
(R. 293.) The arguments the appellant now raises are different from those he raised at trial. Further, although he objected during Freine's subsequent testimony about the still shots, the trial court sustained those objections. Therefore, he does not have an adverse ruling on those objections. Accordingly, we review his arguments for plain error. See Rule 45A, Ala. R.App. P.
*870 Before the prosecutor played the videotape for the jury, Freine testified that he went to the crime scene on December 12, 1998; that the videotape was recovered from the pawnshop's surveillance camera; that he had reviewed the videotape on several occasions; that he had reviewed the videotape on the day of the trial; and that the still shots had been made from the videotape. He also testified about the portion of the videotape from which the still shots had been taken. Although he commented about what the still shots showed, we do not find that his comments invaded the province of the jury. Based on his observation of the actual crime scene and his investigation of the offenses, he properly described what the still shots depicted. Therefore, we find do not find that there was any plain error in this regard.

XXVII.
The appellant's twenty-seventh argument is that the State did not present sufficient evidence to support his robbery-murder convictions. Specifically, he contends that the State did not establish that a robbery occurred because the evidence did not show that he took anything.
"The following are capital offenses:
"....
"(2) Murder by the defendant during a robbery in the first degree or an attempt thereof committed by the defendant."
§ 13A-5-40(a), Ala.Code 1975 (emphasis added).
"A person commits the crime of murder if:
"(1) With intent to cause the death of another person, he causes the death of that person or of another person...."
§ 13A-6-2(a), Ala.Code 1975.
"A person commits the crime of robbery in the first degree if he violates Section 13A-8-43 and he:
"(1) Is armed with a deadly weapon or dangerous instrument; or
"(2) Causes serious physical injury to another."
§ 13A-8-41(a), Ala.Code 1975.
"A person commits the crime of robbery in the third degree if in the course of committing a theft he:
"(1) Uses force against the person of the owner or any person present with intent to overcome his physical resistance or physical power of resistance; or
"(2) Threatens the imminent use of force against the person of the owner or any person present with intent to compel acquiescence to the taking of or escaping with the property."
§ 13A-8-43(a), Ala.Code 1975.
"This Court in Seawright v. State, 479 So.2d 1362, 1368 (Ala.Cr.App.1985), ... stated:
"`Prior to adoption of the present robbery statutes, there was no statutory robbery provision in this state and the common law prevailed. See Williams v. State, 48 Ala.App. 737, 267 So.2d 526 (1972). "The criminal code definition of robbery has thus altered the common law definition. When robbery was made a statutory offense, the test for the sufficiency of a robbery indictment was changed. The indictment is judged by the statutory language and elements instead of the former common law elements." Smith v. State, 446 So.2d 68, 72 (Ala.Crim.App.1984).
"`In Grace v. State, 431 So.2d 1331, 1333 (Ala.Crim.App.1982), this court stated:
"`"Common law robbery required a `taking' of property from the person of *871 another. Wilson v. State, 268 Ala. 86, 105 So.2d 66 (1958), although the amount of value of the property taken was immaterial, Sanders v. State, 289 Ala. 224, 266 So.2d 802 (1972); Harris v. State, 44 Ala.App. 449, 212 So.2d 695 (1968).
"`"The present robbery statutes, however, do not require a `taking' of property, Marvin v. State, 407 So.2d 576 (Ala.Cr.App.1981); Ala.Code §§ 13A-8-40 through 13A-8-44 (1975) (Commentary), so that not only is the value of the property immaterial, but also the indictment need not allege an actual theft to constitute the offense. The operative words of the current robbery statute are `in the course of committing a theft,' which includes an attempted theft, Marvin v. State, supra, rather than the common law element of an actual `taking from the person.'" (Emphasis added.)'"
Woods v. State, 789 So.2d 896, 906 (Ala.Crim.App.1999), aff'd, 789 So.2d 941 (Ala.2001).
"We additionally note that § 13A-5-40(a)(2), Ala.Code 1975, proscribes an attempted robbery as well as a completed theft; therefore, even if there had been no proof at trial that [the appellant] had actually stolen any property from the victims, his capital convictions for murder committed during a robbery in the first degree would still be proper. See Johnson v. State, 473 So.2d 607, 611 (Ala.Cr.App.1985)."
Melson v. State, 775 So.2d 857, 867 (Ala.Crim.App.1999), aff'd, 775 So.2d 904 (Ala.2000).
The State presented evidence that the appellant entered the pawnshop armed with a shotgun and shot the three people who were in the shop. He then attempted to remove the cash register from the pawnshop, but he was not able to do so. Also, the appellant subsequently admitted to law enforcement officers that he and his accomplices had discussed robbing the pawnshop and that he had tried unsuccessfully to open the cash register. Based on this evidence, the jury could have reasonably concluded that, although he did not actually take anything from the pawnshop, the appellant committed a robbery. Therefore, his argument is without merit.

XXVIII.
The appellant's twenty-eighth argument is that "[e]volving standards of decency have rendered unconstitutional Alabama's method of execution." (Appellant's brief at p. 146.) Section 15-18-82(a), Ala.Code 1975, which became effective on July 1, 2002, modified Alabama law to provide for execution by lethal injection unless the person elects to be executed by electrocution. Therefore, the appellant's arguments about execution by electrocution are moot.

XXIX.
The appellant's twenty-ninth argument is that "[t]he death penalty was disproportionate in this case." (Appellant's brief at p. 149.) For the reasons set forth in Part XXXIII of this opinion, the appellant's sentence is not disproportionate. Therefore, his argument is without merit.

XXX.
The appellant's thirtieth argument is that the trial court improperly treated robbery as both an element of the capital offenses and as an aggravating circumstance.
"`This practice, known as "double counting" or "overlapping," has been upheld. Haney v. State, 603 So.2d 368 (Ala.Cr.App.1991), aff'd, 603 So.2d 412 (Ala. *872 1992), cert. denied, 507 U.S. 925, 113 S.Ct. 1297, 122 L.Ed.2d 687 (1993); Kuenzel [v. State, 577 So.2d 474, 489 (Ala.Cr.App.1990), aff'd, 577 So.2d 531 (Ala.), cert. denied, 502 U.S. 886, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991)].
"`Section 13A-5-50, Code of Alabama 1975, states, in part, as follows:
"`"The fact that a particular capital offense as defined in section 13A-5-40(a) necessarily includes one or more aggravating circumstances as specified in section 13A-5-49 shall not be construed to preclude the finding and consideration of that relevant circumstance or circumstances in determining sentence."
"`Clearly, § 13A-5-50 provides that a jury may consider an element of capital murder as an aggravating circumstance if that element is listed in § 13A-5-49. Further, this court has repeatedly held that the use of an element of capital murder in such a way does not, as the appellant argues, punish a defendant twice for the same offense. Kuenzel, supra; see also Ex parte Kennedy, 472 So.2d 1106 (Ala.), cert. denied, 474 U.S. 975, 106 S.Ct. 340, 88 L.Ed.2d 325 (1985).
"`"A capital punishment scheme, under which the same felony may form the basis of an essential element of the crime and an aggravating circumstance for consideration by the jury in recommending a sentence, does not constitute a denial of the guarantee against double jeopardy."
"`Kuenzel, 577 So.2d at 488, quoting Fortenberry v. State, 545 So.2d 129, 142 (Ala.Cr.App.1988), aff'd, 545 So.2d 145 (Ala.1989), cert. denied, 495 U.S. 911, 110 S.Ct. 1937, 109 L.Ed.2d 300 (1990).'
"Burton, 651 So.2d at 657-58."
Hutcherson v. State, 677 So.2d 1174, 1201 (Ala.Crim.App.1994), rev'd on other grounds, 677 So.2d 1205 (Ala.1996). Therefore, the appellant's argument is without merit.

XXXI.
The appellant's thirty-first argument is that the trial court did not adequately preserve the record for appellate review. However, pursuant to requests by both parties and this court, the transcript has been corrected and/or supplemented on several occasions. Although the appellant asserts that portions of the proceedings may not have been transcribed, the trial court and the court reporter have indicated that everything that was made a matter of record has been submitted to this court. As with any transcript, there may still be some small inconsistencies, most likely due to typographical errors or misstatements by attorneys, from place to place. However, the appellant has not asserted what arguments he has not been able to make and has not shown any prejudice due to any inconsistencies in the record. We are satisfied from our review of the record, as supplemented, that it provides a sufficient record from which we can conduct our review. Therefore, the appellant's argument is without merit.

XXXII.
The appellant's thirty-second argument is that the cumulative effect of all of the above-referenced allegations of error requires reversal. We have considered each of the allegations of error individually, and we have not found that any of those allegations of error require reversal. We have also considered the allegations of error cumulatively, and we do not find that "the accumulated errors have `probably injuriously affected [the appellant's] substantial rights.'" Ex parte Woods, 789 So.2d 941, 942-43 n. 1 (Ala.2001) (quoting Rule 45, *873 Ala. R.App. P.). Therefore, the appellant's argument is without merit.

XXXIII.
Pursuant to § 13A-5-53, Ala.Code 1975, we are required to address the propriety of the appellant's convictions and sentence of death. The appellant was indicted for and convicted of two counts of capital murder because he committed the murders during the course of a robbery, see § 13A-5-40(a)(2), Ala.Code 1975, and an additional count of capital murder because he murdered two people pursuant to one scheme or course of conduct, see § 13A-5-40(a)(10), Ala.Code 1975.
The record does not reflect that the sentence of death was imposed as the result of the influence of passion, prejudice, or any other arbitrary factor. See § 13A-5-53(b)(1), Ala.Code 1975.
The trial court found that the aggravating circumstances outweighed the mitigating circumstances. It found that the State proved one aggravating circumstance  the appellant committed the capital offenses while he was engaged or was an accomplice in the commission of, or an attempt to commit, or flight after committing or attempting to commit, robbery. See § 13A-5-49(4), Ala.Code 1975. The trial court found that two statutory mitigating circumstances existed: 1) the appellant did not have a significant history of prior criminal activity, see § 13A-5-51(1), Ala.Code 1975, and 2) the age of the appellant at the time of the crime, see § 13A-5-51(7), Ala.Code 1975. It also made the following findings as to nonstatutory mitigating circumstances:
"During the penalty phase of the trial both before the jury and the Court the Defendant presented evidence of non-statutory mitigating circumstances. The Defendant presented evidence that the Defendant suffered from limited mental capacity. The evidence presented showed that he seemed fairly bright until he reached the age of about 14 or 15 and then began acting out in strange ways. Evidence was presented that he was in a low to borderline range of intellect so therefore the Court finds that there was evidence that supports this as a non-statutory mitigating circumstance. The Defendant presented evidence that he was a father with two small children however each of the victims were parents with children who have now been deprived of a parent by the Defendant's actions. The evidence clearly established that he had fathered two children and the Court takes that into consideration. The Defendant next argues in mitigation that he cooperated with law enforcement. It is true that when he was located in Georgia after leaving the scene of the crime he confessed to his crime. The Defendant further shows in mitigation that he was remorseful for the crime that he committed. Also, in mitigation, the Defendant presented evidence that he was a good employee at the jobs that he held. The Defendant also presented in mitigation the fact that his family loves him."
(C.R. 125-26.) The sentencing order shows that the trial court weighed the aggravating and mitigating circumstances and correctly sentenced the appellant to death. The record supports its decision, and we agree with its findings.
Section 13A-5-53(b)(2), Ala.Code 1975, requires us to weigh the aggravating and mitigating circumstances independently to determine the propriety of the appellant's sentence of death. After independently weighing the aggravating and mitigating circumstances, we find that the death sentence is appropriate.
*874 As required by § 13A-5-53(b)(3), Ala.Code 1975, we must determine whether the appellant's sentence was disproportionate or excessive when compared to the penalty imposed in similar cases. The appellant committed murder during the course of a robbery and killed two people pursuant to one scheme or course of conduct. Similar crimes are being punished by death throughout this state. See Gaddy v. State, 698 So.2d 1100 (Ala.Crim.App.1995), aff'd, 698 So.2d 1150 (Ala.1997); Brooks v. State, 695 So.2d 176 (Ala.Crim.App.1996), aff'd, 695 So.2d 184 (Ala.1997); Bush v. State, 695 So.2d 70 (Ala.Crim.App.1995), aff'd, 695 So.2d 138 (Ala.1997); Taylor v. State, 666 So.2d 36 (Ala.Crim.App.), opinion extended after remand, 666 So.2d 71 (Ala.Crim.App.1994), aff'd, 666 So.2d 73 (Ala.1995); Holladay v. State, 549 So.2d 122 (Ala.Crim.App.1988), aff'd, 549 So.2d 135 (Ala.1989); Siebert v. State, 555 So.2d 772 (Ala.Crim.App.), aff'd, 555 So.2d 780 (Ala.1989); Peoples v. State, 510 So.2d 554 (Ala.Crim.App.1986), aff'd, 510 So.2d 574 (Ala.1987). Therefore, we find that the sentence was neither disproportionate nor excessive.
Finally, we have searched the entire record for any error that may have adversely affected the appellant's substantial rights, and we have not found any. See Rule 45A, Ala. R.App. P.
Accordingly, we affirm the appellant's convictions and sentences.
AFFIRMED.
McMILLAN, P.J., and COBB, SHAW, and WISE, JJ., concur.
NOTES
[1] Some of the supplements were made based on motions by the parties, and some were made based on orders of this court.
[2] Dr. Blanton had a Ph.D. in counseling and educational psychology.
[3] Dr. Blanton testified that a psychometrist is a person who gives certified psychological tests and educational tests.
[4] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[5] In a footnote in his reply brief, the appellant argues that the State improperly used two-thirds of its peremptory strikes to remove one-half of the female veniremembers. Because he did not present this argument to the trial court, we review it for plain error. See Rule 45A, Ala. R.App. P. We have thoroughly reviewed of the record of the jury selection proceedings, and we do not find that there is any inference of discrimination on the basis of gender. Therefore, we do not find that there was any plain error in this regard.
[6] The appellant makes several arguments in his brief about the strike of veniremember 213.
[7] In a footnote, the appellant also asserts that the State did not prove that he voluntarily waived extradition. However, he did not present this argument to the trial court. Therefore, we review it for plain error. See Rule 45A, Ala. R.App. P.

The record on appeal does not include any information regarding the appellant's waiver of extradition and the circumstances surrounding his extradition. Therefore, we do not find that there was any plain error in this regard. See Ex parte Watkins, 509 So.2d 1074 (Ala.1987).
[8] In a footnote, the appellant argues that it was improper for the trial court to instruct the veniremembers on their roles during the penalty phase before they had been selected as jurors. Because he did not present this argument to the trial court, we review it for plain error. See Rule 45A, Ala. R.App. P.

We have thoroughly reviewed the jury selection proceedings, and we conclude that the trial court was simply explaining the course the trial would follow and providing enough information to determine whether the veniremembers could fulfill their roles as jurors. Furthermore, the jury recommended a sentence of imprisonment for life without the possibility of parole. Therefore, error, if any, was harmless. See Rule 45, Ala. R.App. P. Accordingly, we do not find that there was any plain error in this regard.
[9] We note that the court reporter filed a supplemental record with respect to these instructions.
[10] In a footnote in his brief, the appellant also argues that the trial court erred when it refused to instruct the jury on the lesser included offense of criminally negligent homicide as a lesser included offense in Count I and Count II. However, the evidence did not support such an instruction as to either count. Therefore, the trial court properly refused to instruct the jury on criminally negligent homicide.
[11] In a footnote, the appellant asserts that he was forced to use a peremptory strike to remove veniremember G.B., even though the trial court had excused him for a hardship, because of veniremember G.B.'s "inability to be fair and impartial as a result of his hardship." (Appellant's brief at p. 81.) Because he did not present this argument to the trial court, we review it for plain error. See Rule 45A, Ala. R.App. P. The record indicates that veniremember G.B. stated that he ran a restaurant, that he did "all the ordering and payroll and everything," that the restaurant closed when he took vacations, and that the restaurant was closed that day. (S.R. 17.) Thereafter, the trial court stated that it was excusing him for cause, but veniremember G.B. stated, "I'll stay." (S.R. 19.) In light of veniremember G.B.'s explanation for his hardship and the fact that he volunteered to stay for the proceedings, there is not any indication that he could not be fair and impartial. Therefore, we do not find any plain error in this regard.
[12] Although the transcript indicates that Wanger said he performed the autopsies at the "UAB campus," he also stated that that was "in the laboratory here in Montgomery." (R. 233.) Therefore, it appears that the reference to UAB is a typographical error and that it should have referred to the AUM campus.